UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

KEITH COOK,                                    :
                                               :
                    Plaintiff,                 :        Civil Action No. 09-cv-8039
                                               :
        -against-                              :        **LOCAL RULE 56.1**
                                               :        **STATEMENT OF MATERIAL**
BANK OF AMERICA & CO., JOHN FRAZZA,            :        **FACTS IN SUPPORT OF**
SUSAN COLE,                                    :        **DEFENDANTS' MOTION**
                                               :        **FOR SUMMARY JUDGMENT**
                    Defendants.                :

------------------------------------------------------------------ x

Pursuant to Local Rule 56.1, Defendant, BANK OF AMERICA, N.A. ("Bank" or
"Defendant"), s/h/a "BANK OF AMERICA & CO.," and named defendants JOHN FRAZZA
("Frazza") and SUSAN COLE ("Cole") submit this Statement of Material Facts In Support Of
Defendants' Motion For Summary Judgment.

### STATEMENT OF MATERIAL FACTS[1]

**Background And Plaintiff's Employment With Defendant**

1.      Keith Cook ("Plaintiff" or "Cook") was employed by Defendant's predecessor, Fleet, as a
Community Investment Officer beginning in around 2000.  Exhibit A, Deposition of Keith Cook,
at 42-43.

2.      Plaintiff's position was eliminated in or around 2003 or 2004 in relation to a corporate
merger.  Id. at 45.

3.      Prior to his termination due to position elimination, Plaintiff was recruited internally for a
position as Regional Markets Manager in the Bank's Neighborhood Lending Wholesale
Mortgage business unit and began in that position in or around May 2004.  Id. at 45 and 48-49.

---

[1] This Statement of Material Facts is undisputed for purposes of Defendants' Motion for Summary Judgment, only,
and Defendant, Frazza and Cole reserve all rights to dispute such facts in any other hearing, trial or other proceeding
in this matter.

4.     In or around October 2005, the Bank reorganized and eliminated the Neighborhood Lending Wholesale Mortgage business unit. Although Plaintiff was offered another position with the Bank, he declined the offer. Id. at 53.

5.     However, before Plaintiff's employment ended, John Frazza, Regional Executive in the Bank's Consumer Real Estate business unit learned of Plaintiff's availability and possible interest in a position on his team. Frazza met with and interviewed Cook, and ultimately hired him for a position as Sales Manager position beginning October 1, 2005, initially for the New York City and Long Island branch. Id. at 53-57; Exhibit B, Deposition of John Frazza, at 30, 35-36, and 55.

6.     Plaintiff reported to Frazza directly until a point in 2006, when Cole was hired as Area Sales Manager, under Frazza. Id. at 55-56.

**Plaintiff Claims Race Discrimination In Relation To SONYMA Training For His Team**

7.     Plaintiff did not make any complaint of race discrimination prior to January 2008. Id. at 199.

8.     Plaintiff claims that the only individuals who engaged in discrimination or retaliation against him are Frazza and Cole. Ex. A at 7.

9.     Plaintiff claims that he first suffered race discrimination in 2006 or 2007, when Cole told him not to coach his team with respect to "SONYMA" training.[2] Id. at 162-165.

10.    When he questioned the decision, Frazza told him that Cole would be conducting the training. Id. at 168-169.

11.    Then Cook was told to get together with his peer, Michael DiDonna, to conduct the training, together. However, this did not occur. Id. at 171-172.

---

[2] State of New York Mortgage Agency

BOS 753967.1

12.    Ultimately, an instructor from SONYMA conducted the training of Plaintiff's team. Plaintiff does not know whether a SONYMA instructor conducted training of his peers' New York sales teams. Id. at 172.

13.    As to the entire basis of Plaintiff's belief that this is race discrimination, Plaintiff testified:

> Because I had previously helped –worked with Bank of America to establish the agreement with both bond loan – three bond loan agencies in three states; New York, New Jersey and Pennsylvania, independent of each other, in Trenton and in –here in Manhattan, as well as in Philadelphia. I was competent in the area. I had already conducted training with my team immediately after assuming the role as mortgage sales manager, so it was odd to me that suddenly I was not able to teach my team something that I was fluent in and understood, and was instructed to find someone else to assist me to do that without any evidence that there had been a deficiency in my team's performance in this area.

Id. at 173-174.

**The Bank Developed And Executed A Plan To Increase Market Share In Frazza's Region**

14.    The direction to Frazza from his senior managers was to increase market penetration in New York, New Jersey, and some other markets within Frazza's region. As a result, Cole worked with the regional management team, including Frazza, to construct a recommendation around how to accomplish the goal of increased market penetration. Cole and Frazza developed a plan and submitted that to their senior management for review, direction and approval. Ex. B at 85.

15.    Plaintiff was responsible for a very large area and understood that the organization had a need to grow. Ex. A at 177.

16.    Sometime in 2007, Plaintiff learned that Long Island was going to be severed from his territory, and Plaintiff felt that was fine. He explained to his team of Mortgage Loan Officers ("MLOs") the need for growth in the organization and that many of them would be given the opportunity to move into other areas. Id. at 178 -179.

3

17.     Plaintiff does not claim that the severance of his territory was an act of retaliation or discrimination.  Id. at 179.

18.     Although some of Plaintiff's MLOs who received referrals from Defendant's consumer banking centers on Long Island were asked to join the new Long Island team, only one actually transferred.  Id. at 181-182.

19.     The other MLOs who were asked to join the new team wrote letters declining to keep the Long Island consumer banking center referrals and stating that they did not wish to transfer.  Id. at 183-184.

20.     Plaintiff claims that one of the MLOs, Providence Aiossa, suffered retaliation for her request not to transfer in that "suddenly investigations on Providence began to pop up regarding allegations of fraud."  Id. at 185-186.

21.     Plaintiff has no knowledge of what prompted the investigations of Aiossa.  Id. at 186.

22.     The Bank has an obligation to investigate any allegations of fraud, regardless of the source of the allegations.  Id. at 186.

**Plaintiff Asked To Be Made A Senior Vice President, But His Request Was Denied**

23.     In 2007, Plaintiff asked to be made a Senior Vice President, but his request was denied by Frazza.  Id. at 192 and 195-196.

24.     Although he requested the title of Senior Vice President, he was not particularly dedicated to achieving the title and didn't care.  He was a mortgage salesperson, comfortably compensated.  Id. at 192-193.

25.     The title of Senior Vice President would not have resulted in any additional compensation to Plaintiff.  Id. at 197.

26.     Plaintiff believes the denial of his request to be made Senior Vice President was race discrimination only because he believes he met the criteria for the title.  Id. at 195.

4

27.     Plaintiff was aware of only one of his peers, Darcy Gore ("Gore"), who had the title of Senior Vice President at the time. Id. at 196.

28.     Although another peer, Cheryl Davis ("Davis"), had also requested to be made Senior Vice President a few months before Plaintiff, she too was denied by Frazza. Plaintiff does not know why Davis' request was denied and could not speculate. Id. at 197.

**Plaintiff's Request For Reimbursement Of A Phone Bill Was Denied Because MLOs Refused to Transfer To Another Team**

29.     Plaintiff claims that prior to January 2008, he submitted a telephone bill for reimbursement. He claims he was working on a project with individuals in the real estate development unit and participated in a conference call with the national sales executive utilizing the bank's wireless system. Id. at 192-193.

30.     Plaintiff requested reimbursement of a $3,000 phone bill for this. Id. at 199.

31.     The Bank did not reimburse the payments. Id.

32.     Plaintiff believes that the Bank's failure to reimburse him for the phone bill was retaliation for the refusal by some of his MLOs to transfer to another manager's team. Id. at 201-202.

33.     As of January 2008, Plaintiff had not made any complaints of race discrimination. Id. at 198-199.

**In January 2008, Plaintiff Received A Verbal Warning For Failure To Follow Policy**

34.     On January 25, 2008, Frazza and Cole communicated a verbal warning to Plaintiff for his failure to adhere to the Customer Complaint Resolution Process. Id. at 282-283 and Ex. 1 (Def.'s Dep. Ex. 2).

35.     Specifically, the verbal warning, which was provided to Plaintiff in writing, cited his failure to follow the policy with respect to the timing of his response to a customer complaints and the quality of the response he drafted.   Ex. A at 282-283.

36.     At the time of the incident, Plaintiff knew that there was a Customer Complaint Resolution Process to which he was expected adhere.  Id. at 283.

37.     Plaintiff claims the verbal warning is race discrimination because he believes that he is the only manager in the institution to get a written warning because of a customer complaint and that it was given to him because he is black.  Id. at 288.

38.     Plaintiff has no personal knowledge as to whether any other manager at the Bank received a verbal warning for similar conduct.  Id. at 289.

**In January 2008, Plaintiff Learned Of Plans To Establish A New Branch For Manhattan**

39.     Plaintiff first learned that Frazza and Cole planned to open a new branch dedicated to the Manhattan market after an administrative assistant approached Plaintiff about a request for additional office space in Manhattan in January 2008. Id. at 209.

40.     Surprised by this, Plaintiff sent an email to Frazza about the request for additional space. Frazza called him and said it was an oversight, that there were growth plans and that he should have told Plaintiff.  Id. at 210.

41.     Later, Plaintiff received a call from an individual in a different line of business who told him there was a posting for a position as Manhattan sales manager in Plaintiff's line of business. Id. at 212.

42.     Plaintiff, himself, never saw the posting for the open position.   Id. at 218.

43.     Again, Plaintiff sent an email to Frazza and inquired about the posting.  Frazza stated that it was an oversight. Id.  at 218.

BOS 753967.1

44.     In January 2008, Frazza held a regional sales meeting in Boston, Massachusetts or Providence, Rhode Island, which Plaintiff attended. Id. at 210.

45.     At that meeting, Cook met with Frazza and Cole in a breakout session.  During that session, Frazza and Cole explained to Plaintiff that his New York City territory was being split to establish a branch dedicated to Manhattan.  Plaintiff would retain the Queens, Bronx, Brooklyn and Staten Island territory.  Plaintiff understood that the intention was not to eliminate his position, but rather to establish a new branch in Manhattan.  Ex. A at 231.

46.     According to Frazza, the goal was to increase the Bank's market penetration within the remaining market and ultimately out-produce where they had been previously.  Ex. B at 90.

47.     At that time, Manhattan represented only 2% of Cook's team's origination concentration. Ex. A at 231-232.

48.     Following the regional sales meeting, some MLOs on Plaintiff's team were asked to meet with Cole, who told them that they had to transfer to the new Manhattan team. Id. at 189. However, none of them joined the Manhattan team at that time. Id. at 221-222.

49.     In January 2008, Plaintiff's assistant was told to transfer to the new Manhattan team. Id. at 202.

50.     Plaintiff considered this attempt to transfer his assistant to be retaliation against him for the fact that his MLOs refused to transfer to another team. Id. at 202-203.

51.     Plaintiff claims that at a January 2008 regional sales meeting in Boston or Providence, Frazza stated to a group of 15 people, including Plaintiff and his peers, "anyone who knows me knows that anyone who opposes me is not long for my world." Id. at 204-207.

52.     At the time, Plaintiff was seated at one end of the table and Frazza was at the other. Id. at 206.

53.     Several individuals looked at Plaintiff when Frazza made the statement. Id. at 204.

7

54.    Frazza did not say Plaintiff's name or make any other specific reference to Plaintiff in the statement. Id. at 207.

55.    Plaintiff believes this comment by Frazza is retaliation against him because Plaintiff's MLOs refused to transfer to a new team. Id. at 207.

**On January 31, 2008, Plaintiff Told Senior Managers He Wanted To Transfer To Another Role With The Bank**

56.    On January 31, 2008, Plaintiff sent an email communication to Frazza's direct manager, Matthew J. Vernon ("Vernon"), and Vernon's manager, James Jackson ("Jackson"), regarding "a series of events which have adversely affected [his] passion for [his] role." Id. at 226, Ex. 2 (Def.'s Dep. Ex. 1).

57.    In the email, Plaintiff states in part that:

> It is clear that trying to make goal in a declining market minus 40% sales volume, minus my Sales Assistant sourcing training replacement recruits who typically require a 6 month ramp up; in a contracting market and against uncertainty of a merger or multiple probabilities which are the product of the individual probabilities.
>
> I began my Career as a Credit trained CPA, I love this job. But given the outlined behaviors and my concerns these odds suggest that I continue my career in another role.
>
> *I'm asking for you cover until I can transition into another role here at Bank of America with an unblemished record.*

Id. (emphasis added).

58.    In the email, Plaintiff was asking Vernon and Jackson for assistance to transfer to another position within the Bank. Id. at 229.

59.    Plaintiff sent the email to Vernon and Jackson after he met with Frazza and Cole in Boston or Providence about the plan to establish a Manhattan branch. Id. at 230-231.

60.    Plaintiff also shared the email with his peers, Mike DiDonna, Davis and Gore. Id. at 228.

8

**Plaintiff Also Told Frazza And Cole He Wanted To Transition To Another Role By March**

61.    Also on January 31, 2008, Plaintiff sent an email to Frazza and Cole stating, in part:

> It is becoming clear to me that I
> Or my efforts for this organization are unwanted. . . . *Against this back ground I*
> *would like for you and john to allow me time to transition out of CRE to another*
> *role in the institution march 1 is the date I'm looking for*

Id. at 413 and Ex. 3 (Defendant's Dep. Ex. 10) (emphasis added).

62.    During this January 2008 time period Plaintiff admits he probably told Cole he wanted to leave his role at the Bank.  Id. at 252.

**Although He Sought Transfer Plaintiff Did Not State That It Is Due To Race Discrimination**

63.    In neither the January 31, 2008 email to Vernon and Jackson, nor the email of the same date to Frazza and Cole, does Plaintiff state that he believes the actions of Frazza and Cole identified in the emails were taken because of his race, nor does he complain of race discrimination. Ex. A, Exs. 2 and 3.

**In February, Cole Told Plaintiff's MLO Job Recruit That He Would Have To Work With Another Manager**

64.    Plaintiff claims that he was recruiting an individual, James Dorcely, to join his team as an MLO in January and February 2008.  Plaintiff claims that after he issued an offer letter to Dorcely and after he sent the January 31, 2008 email to Vernon and Jackson, Dorcely met with Cole. Id. at 252.  Plaintiff claims that Cole told Dorcely that he would have to work with another manager and would not be working for Plaintiff and that Plaintiff would not be here. Id. at 242.

65.    Plaintiff claims that Cole's alleged statements to Dorcely are both retaliation and race discrimination.  Id. at 249-250.

BOS 753967.1

66.     With respect to retaliation, Plaintiff claims that Cole's statement to Dorcely is retaliation for the refusal by some of the MLOs on Plaintiff's team to transfer to the Long Island branch in or around 2007.  Id. at 250.

67.      With respect to race discrimination, Plaintiff claims that Coles' statement to Dorcely is race discrimination because:

> There was no other manager who has a recruit with an offer letter issued in their name, who's left their job, who has been told that they're not going to work for that manager, and who was also told that that manager would not be there during the interview when there was no indication at that time that I was leaving to go anywhere.
>
> At least shared to me.

Id. at 250-251.

68.     Cole's meeting with Dorcely was after January 31, 2008, when Plaintiff had indicated via emails to senior managers, his desire to transfer or transition to a new role.  Id. at 252.

**In March 2008, Plaintiff Received A Written Warning For Failure To Follow Policy**

69.     In March 2008, Frazza issued Plaintiff a written warning dated March 20, 2008, for Plaintiff's failure to follow Bank policy and procedures.  Id. at 289-290 and Ex. 4 (Defendant's Dep. Ex. 3).

70.     Specifically, the warning cited Plaintiff's "failure to comply with bank policy and procedures when managing an associates declining performance."  Id., Ex. 3.

71.     The warning resulted from an investigation conducted by Ashley Oates ("Oates"), Human Resources Advisor in the Bank's Advice & Counsel unit.  The investigation was initiated by a telephone call to Advice & Counsel, which was handled by Oates, on January 18, 2008, from a former associate who had been terminated by Cook.  Ex. C, Declaration of Oates, ¶ 5.

72.     The former associate was concerned about what she perceived to be difference in treatment of her by Cook .  She told Oates that her production numbers began to decline in

10

October 2008.  She stated she received a written warning from Cook related to an exam she had not taken, but she explained that she had, in fact taken the exam and it was not yet showing up in the Bank's computer system as completed.  She told Oates that Cook had made her aware of the problem with her declining production and she had email communications about this.  However, she stated that she had not received an actual written warning for declining production.  Id., ¶ 7.

73.     On February 1, 2008, Oates called Cole, Plaintiff's manager.  Oates advised Cole that a former associate was appealing a termination and that that Oates had not been able to contact Cook.  Oates advised Cole that she needed information to support the termination of the associate.  Id., ¶ 13.

74.     On February 1, 2008, Oates received an email from Cook regarding the terminated associate.  In his email, Cook stated that "a written warning providing [the associate] notice was provide 30 days before her termination."  Id., ¶ 14.

75.     On February 7, 2008, Oates participated in a conference call with Cole and Cook.  At that time Cook told Oates that he did not have any disciplinary action related to the associate which associate had signed.  He also told me that Oates that he had not called Advice & Counsel to speak with an advisor before he terminated the associate.  Id., ¶ 15.

76.     Cook provided a copy of a termination email to Oates which he had sent to the associate.  The email, dated December 19, 2007, informed the employee that her employment would end on January 1, 2008.  Id., ¶ 16.

77.     When Oates inquired of Cook whether the associate had resigned or whether she was terminated, he responded that both had occurred.  He explained that the employee came to a meeting and said she was not a good fit.  However, she had not provided a resignation letter to him.  Id., ¶ 17.

11

BOS 753967.1

78.     Oates asked Cook why he sent an email to terminate the associate if she had resigned, and he responded that he did so to confirm her separation from the Bank.  Id., ¶ 18.

79.     On February 8, 2008, Oates called Cole and advised her that Cook had not followed proper procedures for the termination of the employee and did not follow the procedures for disciplinary action.  Oates advised Cole that Cook's conduct would support either a verbal warning or a written warning for Cook.  Oates advised Cole that Cook should complete one of the Bank's class offerings called Managing Declining Performance.  Oates advised Cole that based on the investigation, in order to address the terminated associate's concern, she should be made eligible for rehire or she should be reinstated as an employee. Id., ¶ 19.

80.     On February 8, 2008, Oates spoke with the associate and advised her that she would be able to submit a resignation to be coded as eligible for rehire with the Bank or she could report back to work on 3/1/2008 as a mortgage loan officer and report to a manager, other than Cook. Id., ¶ 20.

81.     On February 14, 2008, Oates spoke with Frazza, Cole's manager.  Frazza advised Oates that he would be issuing disciplinary action to Cook for failure to contact Advice & Counsel before termination of an associate and for not following standard procedure for terminations.  At that time, Oates learned that Cook was issued a prior verbal warning for failure to follow the line of business complaint procedure.  Therefore, a written warning was appropriate for Cook's failure to follow policy and procedure regarding disciplinary action and management of declining performance. Id., ¶ 21.

82.     The investigation and Oates' recommendations were based on and initiated solely by a call from the terminated associate to the Bank's Advice & Counsel telephone unit on January 18, 2008. Id., ¶ 22.

BOS 753967.1

83.     The written warning issued to Cook states that "[t]his written warning specifically relates to your failure to contact Advice and Counsel prior to the termination of [the associate]." Ex. A, Ex. 4. [Def's Dep Ex. 3]

84.     The warning further provides, "It is required that you immediately take the HR class 100005, Managing Declining Performance." Id. and Ex. A at 294 and Ex. 4.

85.     Plaintiff alleges that the written warning is an incident of race discrimination and retaliation. Id. at 297.

86.     Plaintiff claims that the written warning is retaliation for his January 31, 2008 email to Vernon and for members of his MLO team not transferring to another manager. Id.

87.     Plaintiff is not aware of any other manager who failed to involve Advice & Counsel in employee disciplinary action, who terminated an employee and who then had that employee make a complaint to the Bank about the termination. Id. at 293.

88.     Plaintiff agrees in relation to the written warning, he failed to involve Advice & Counsel in an employee's disciplinary action, he terminated the employee and then that employee made a complaint about the termination to the Bank. Id. at 293-294.

89.     Plaintiff received the written warning on March 20, 2008, but Plaintiff did not immediately take the required HR class 100005, Managing Declining Performance.

90.     Although he was asked to sign the warning and return it to Frazza, Plaintiff does not know whether he ever did do so. Id. at 298.

91.     Frazza expected that as a manager, Plaintiff would follow disciplinary procedures set by the Bank and the line of business, including for MLOs with declining production. This would include counseling, a verbal warning, a written warning a final written warning and an action plan for improvement, all with consistent communication by the manager with Advice & Counsel. Ex. B at 106.

13

BOS 753967.1

92.    Frazza had provided consistent direction to his management team that they were not to terminate associates without calling Advice & Counsel first. Id. at 106-107.

93.    Even after receiving the written warning, Plaintiff did not call Advice & Counsel on every associate performance problem. Ex. A at 302-304. He believed that he had no reason to include Advice & Counsel on verbal warnings for his team members, even in light of his written warning. Ex. A at 302-304.

### In June 2008 Plaintiff Was Asked Questions About The Reassignment Of An MLO To A Residential Development

94.    On June 3, 2008, Plaintiff removed an MLO from a residential development. In relation to this action, on June 4, 2008, Plaintiff sent an email to another manager and sent cc copies to Cole and Frazza. In the email, Plaintiff states with respect to the MLO, " I have covered for him for a while and I don't have the political capital to continue." Ex. A at 416 and Ex. 5, (Defendant's Dep. Ex. 13).

95.    Following that email, Plaintiff participated in a conference call with Frazza and others, in which they wanted to know what Plaintiff meant by "political capital." Id. at 307-308.

96.    Plaintiff claims that the conference call was race discrimination against him. Id. at 305-306.

97.    Plaintiff does not allege that he received formal disciplinary action of a verbal or written warning from his managers concerning this incident. Id. at 306. He alleges only that he had to participate in a conference call.  Id.

98.    Frazza, who was copied on the particular email, was concerned about the words Plaintiff used and that Plaintiff had not previously raised his concerns about the MLO to Frazza or Cole. Ex. B at 128-129. [Frazza Dep]

99.     Frazza consulted with and advisor in Advice & Counsel about this situation.  In order to get a better understanding of what the situation was, make sure that there were no other problems to address, and so they could respond to a complaint by the MLO who had been removed, Advice & Counsel recommended that Frazza put together some questions to be answered by Plaintiff.  Id. 128-129 and 134-135.

**In June 2008, Plaintiff Complained To Human Resources That Frazza And Cole Were Engaged in Retaliation**

100.    On June 4, 2008, Plaintiff called Advice & Counsel.  He spoke with Advisor, Mary Elizabeth George ("George") and inquired about the transfer policy.  During the call, he expressed a concern that he felt there was a conscious effort to negatively impact his performance as a manager.  In that, he expressed some concerns about his own manager, Cole, with respect to her management style.  He stated that he did not feel that he could discuss his concerns with his manager.  George recommended that he contact the HR Manager assigned to his line of business, Caslin, to discuss the transfer policy.  Ex. D, Declaration of George, ¶ 6.

101.    Cook did not state to George that he felt discriminated against because of his race, treated differently because of his race or anyone else's race, subjected to a racially hostile environment or indicate that his concerns were related to his race or the race of anyone else. He did not allege that anyone used any racial epithet or made any racially derogatory remarks to him or about him. Id. at ¶ 7.

102.    Also, on June 4, 2008, Plaintiff sent an email to Caslin. Ex. A at 387-88 and Ex. 6 (Def.'s Dep. Ex. 7).  In the email Plaintiff did not state anything about discrimination and retaliation. Ex. A at 388.

103.    The subject line of the June 4, 2008 email is "I was directed by Advice and Counsel to discuss Career concern." Id. and Ex.6.

104.   In the body of the email, Plaintiff stated, "I am not very happy with my current job and would like to discuss options." Id.

105.   On June 6, 2008, Plaintiff sent another email to Caslin. Id. In that email, Plaintiff mentioned a "documentable pattern of retaliation." Id. at 388-391 and Ex. 7 (Plaintiff's Ex. 32).

106.   However, Plaintiff did not mention discrimination, his own race or the race of his peers. Id. at 388-389.

107.   Following Plaintiff's first call with George in Advice & Counsel, George received an email communication written by Cook in which he alleged retaliation and hostile work environment.  Again, this communication did not indicate any allegation of race discrimination, difference in treatment due to his race or that of anyone else, or that the hostile work environment was racially hostile. Ex. D at ¶ 8 [George Decl.]

108.   Plaintiff never raised any concern to George that any manager of his used any racial epithet or racially derogatory language to him or about him. Id. at ¶ 9.

109.   Plaintiff does not recall the substance and subject matter of his conversations with George. Ex. A at 397-398.

110.   By "documentable pattern of retaliation," as used in Plaintiff's June 6, 2008 email to Caslin, Plaintiff meant the comments allegedly made by Frazza at the regional sales meeting in Boston or Providence in January 2008. Id. at 405-406.

111.   Plaintiff also stated in the June 6, 2008 email that an area sales manager had said "I can get anyone fired if I really want them fired."  He alleges that Cole is the area sales manager who made this statement. Id. at 400.

112.   Plaintiff was not present when the alleged comment by Cole was made. Id. at 401.  He heard about the comment from his peer, Davis.  Id.  Plaintiff believes that the comment was about him.  Id.

113.    Plaintiff has no personal knowledge regarding the comment was in fact made, the context of the comment or whether the comment was related to him or someone else. Id. at 404-405.

114.    Plaintiff never raised any concern to George, of Advice & Counsel, that any manager of his used any racial epithet or racially derogatory language to him or about him. Ex. D at ¶ 9 [George Decl]

115.    As a result of Plaintiff's concerns of retaliation and hostile work environment, George conducted an investigation.  At no time during her investigation did Plaintiff, or any other individual interviewed by her, express to that Plaintiff was subjected to race discrimination, different treatment because of his race or anyone else's race, or a racially hostile work environment. Ex. D at ¶ 10.

116.    At not time during George's investigation regarding Plaintiff's concerns did Cook, or any other individual interviewed by her, express to her that any manager had used any racial epithet or racially derogatory language to Plaintiff or about Plaintiff. Id. at ¶ 11.

117.    In the course of her investigation, George spoke with Davis.  Davis confirmed that she had heard Cole state "I can get anyone fired if I want them to be fired," but that the context of the conversation and comment were not about or related to Plaintiff.  Id. at ¶ 12.

118.    George's investigation of the concerns raised by Plaintiff closed on or around August 4, 2008.  Id. at ¶ 13.

**In late August 2008, Plaintiff Was Asked Questions About His Decision To Replace Closing Attorneys On A Particular Residential Development**

119.    In August 2008, Plaintiff removed certain closing attorneys from mortgages related to a particular development.  Plaintiff alleges that he had concerns about certain UCC filings.  Ex. A at 316-319.

17

120.    Prior to taking this action, Plaintiff did not tell Frazza or Cole about the replacement of closing attorneys or his underlying concerns and reasons for the removal. Id. at 320-321.

121.    Although Plaintiff knew that the original closing attorneys were going to elevate their complaint about their removal before they did so, he did not tell Frazza and Cole. Id. at 324-325.

122.    Frazza learned about the removal of the original closing attorneys assigned to the mortgages when those attorneys made a complaint about their removal from the project to James Jackson, Frazza's manager's manager.  Ex. B at 185-186.

123.    Prior to their receipt of the attorneys' complaint, Plaintiff did not tell Frazza and Cole about his concerns or the attorneys' claims.  Ex. A at 324.

124.    When Jackson requested that Frazza please advise him about the closing attorneys' complaint, Frazza asked Plaintiff to draft a response for Frazza to review.  Ex. B at 185-186.

125.    Instead, Plaintiff responded directly to Jackson and did not copy Frazza on the response. Id.

126.    Frazza considered this incident and Plaintiff's actions in relation to it as examples of Plaintiff's unwillingness to communicate with his direct management reporting structure and Plaintiff's tendency to make decisions outside of that management reporting structure.  Id. at 187-188.

127.    Frazza learned by September 2008, that even after being placed on a written warning in March which directed him to immediately take a specific HR class on how to manage declining performance of his direct reports, Plaintiff did not take the class and was not following the Bank's procedures for progressive discipline of MLOs regarding failure to meet production goals.  Id. at 153, 295, 306-307.

128.    As a branch manager, Plaintiff was directly responsible for the performance management of his direct reports.  Id. at 313.

18

**By Late September 2008 Frazza Had Decided To Terminate Plaintiff**

129.    In September 2008, Diana Rhine of Advice & Counsel was looking into Plaintiff's failure to provide timely monthly audits for August, his failure to performance manage his MLOs using the Bank's guidelines and the line of business action plans, issues concerning support for his disciplinary action decisions with respect to his MLOs, his failure to follow Frazza's management directive with respect to a draft response regarding his removal of the closing attorneys in August, and Plaintiff's various statements regarding his failure to sign or acknowledge and return the March 2008 written warning to his management team.  Ex. E at 276-279. [Rhine Dep.].

130.    In September 2008, Frazza, in consensus with Rhine of Advice & Counsel and Caslin, HR Manager, made the decision to terminate Plaintiff in relation to concerns about trust and confidence regarding Plaintiff's management of his branch. Ex. B at  151-152 and 183-184; Ex. F, at 146-147 , 163-164 and 174-176 [Caslin Dep.].

131.    Loss of trust and confidence is a term used in the Bank to sometimes refer to concerns about judgment in decision making. Ex. F, at 146-147 [Caslin Dep.]

132.    Frazza had concerns about Plaintiff's inability to follow standard performance management process with respect to Plaintiff's MLOs. Ex. B, at 150-153, 184, and 306-307.

133.    Frazza also had concerns about Plaintiff's lack of communication within his direct line of management. Id. at 150-153, 184 and 187-188.

**Before The Termination Decision Was Communicated To Plaintiff He Took A Family Leave Of Absence**

134.    Frazza, Rhine and Caslin developed talking points in advance of the termination discussion with Plaintiff.  Ex. F at 174-176 [Caslin Dep.]

BOS 753967.1

135.   Before the termination decision could be communicated to Plaintiff, he went out on a family leave.  Id.

**When Plaintiff Returned From His Family Leave, Frazza Placed Him On Paid Administrative Lave In Relation To An Internal Security Investigation**

136.   In November 2008, an anonymous letter to the Bank prompted a security investigation. The case was assigned to Regina Forest, then Senior Investigation for the Bank's Special Markets group.  Ex. G , Deposition of Regina Forest, at 32-33 and 52-53.

137.   The investigation related to allegations concerning whether referral fees were paid to mortgage brokers from certain MLOs in Plaintiff's branch in violation of policy.  Id. at 47-48.

138.   When Plaintiff's leave of absence ended, he was placed on paid administrative leave regarding a then-current, internal security investigation.  Ex. A at 424-425 and Ex. B at 204.

139.   In relation to the paid administrative leave during the security investigation, Plaintiff was directed not to take part in any bank work related activities/communications or return to work until further notice.  Ex. A at 425.

140.   In relation to the paid administrative leave, Plaintiff understood that if he had any questions regarding who he may discuss the matter with, he was to contact his manager.  Id. at 428.

**During The Investigation, Plaintiff Violated The Bank's Electronic Communications Policy And The Terms Of His Paid Administrative Leave**

141.   Plaintiff was under an obligation to cooperate with the security investigation by Forest. Id. at 98.

142.   Bank policy prohibits sending personal customer information by email through unsecure means.  Id. at 98.

143.   While on paid administrative leave, Plaintiff requested that his assistant send him certain documents which contained customer names and loan numbers to his personal blackberry email

20

account.  Plaintiff then sent the same documents with customer names and loan numbers to someone at the Bank from his personal Blackberry email account.  Ex. A at 430 and Ex. G [Forest Dep.] at 98, 102-106 and 122-125.

144.  Forest learned Plaintiff had his assistant that he was working on something for work from home and his work Blackberry and laptop were disconnected or not working.  Forest concluded that Plaintiff led his assistant to believe he was working, even though he had been instructed not to take part in any bank work related activities/communications.  Id. at 121-124.

145.  At the time Plaintiff did this, he had not been asked by Forest to provide any information and Forest had not informed him of anything about her investigation.  Id. at 125.

146.  Forest concluded that Plaintiff had violated Bank policy when he engaged in this conduct. Id. at 134-135.

147.  When Forest interviewed Plaintiff in her investigation, he explained that another security investigator, Noel Barreto, had requested the documents related to the customer names and loan numbers.  However, Barreto told Forest he did not ask Plaintiff to send the information.  Id. at 102-103.

148.  Even after Forest directed Plaintiff to submit any information he wanted to share with her by facsimile and he could not violate the email policy any longer, he sent customer information to her from an unsecured email account.  Id. at 110-112.

149.  Plaintiff received a letter from the Bank stating, "you are being sent this letter to notify you that the Security Investigation and review of your performance has been concluded.  Your employment with Bank of America is terminated effective March 26, 2009 due to your work performance and actions during the security Investigation which has cause us to lose trust or confidence in you as a Bank associate." Ex. A at 452 and Ex. 8 (Def.'s Dep. Ex. 26).

BOS 753967.1

150.    Neither  Frazza nor Cole testified to receipt of service of the Summons and Complaint in

this matter.  Ex. B at 266-267 and Ex. H, Deposition of Cole, at 6-7.


Dated: New York, New York
          May 14, 2010

                                        Respectfully submitted,

                                        KAUFMAN BORGEEST & RYAN LLP

                                        By: */s/ Jonathan B. Bruno*
                                               Jonathan B. Bruno
                                               Deborah M. Zawadzki
                                               Attorneys for Defendants
                                               120 Broadway, 14th Floor
                                               New York, New York 10271
                                               (212) 980-9600
                                               KBR File No.: 860.198

To:     Tracey Brown, Esq.
          The Cochran Firm
          Attorneys for Plaintiff
          233 Broadway, 5th Floor
          New York, New York 10279

BOS 753967.1