# EXHIBIT A

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------------x

5    KEITH COOK,

6                        Plaintiff,

7            -against-

8    BANK OF AMERICA & CO., JOHN FRAZZA AND
     SUSAN COLE,

9                        Defendants.

10   Docket No. 09 CV 8039

11   ----------------------------------------x

12

13

14       DEPOSITION of the Plaintiff, KEITH

15   COOK, taken by the Defendants, held at the

16   law offices Edwards, Angell, Palmer &

17   Dodge, LLP, 750 Lexington Avenue, New

18   York, New York, on March 11, 2010,

19   commencing at 10:05 a.m., before Michele

20   D. Lucchese, a Shorthand Reporter and Notary

21   Public within and for the State of New York.

22

23

24

25       Job No: 233614

2

1

2    A P P E A R A N C E S:

3

4    THE COCHRAN FIRM

5    Attorneys for Plaintiff

6         233 Broadway

7         Woolworth Building

8         New York, New York 10279

9    BY:  TRACEY L. BROWN, ESQ.

10

11   EDWARDS, ANGELL, PALMER &  DODGE, LLP

12   Attorneys for Defendants

13        111 Huntington Avenue

14        Boston, Massachusetts 02199-7613

15   BY:  SIOBHAN SWEENEY, ESQ.

16

17                  oOo

18

19

20

21

22

23

24

25

3

```
 1
 2              S T I P U L A T I O N S
 3
 4      IT IS HEREBY STIPULATED AND AGREED
 5    by and between the attorneys for the
 6    respective parties herein that the
 7    sealing, filing and certification of the
 8    transcript of the within examination
 9    before trial be, and the same hereby are
10    waived.
11      IT IS FURTHER STIPULATED AND AGREED
12    that said transcript may be signed and
13    sworn to before any Notary Public or
14    Commissioner of Deeds with the same force
15    and effect as if signed and sworn to
16    before an officer of this Court;
17      IT IS FURTHER STIPULATED AND AGREED
18    that all objections, except as to the form
19    of the questions, are reserved for the
20    time of trial.
21                    oOo
22
23
24
25
```

7

```
1                    Cook
2    that you had filed in this case?
3        A.    I did not review that.
4        Q.    As you understand it, what are
5    the claims that you are making against
6    Bank of America?
7        A.    Racial discrimination and
8    retaliation.
9        Q.    What individuals of Bank of
10   America do you claim discriminated against
11   you based on your race?
12       A.    Sue Cole and John Frazza.
13       Q.    Anyone else?
14       A.    That's it.
15       Q.    And what individuals do you claim
16   retaliated against you?
17       A.    Sue Cole and John Frazza.
18       Q.    Anyone else?
19       A.    No.
20       Q.    I just want to start with you
21   giving me a brief description of your
22   background.  Let's start with your
23   educational background.  Could you
24   describe that for me?
25       A.    Sure.  I attended Howard University.
```

1              Cook

2    component?

3        A.    No.

4        Q.    So, is it correct that in or

5    around 1999 you had approximately sixty to

6    $70,000 worth of income from SOBRO and

7    another $45,000 --

8        A.    Plus or minus.

9        Q.    I have to finish my question.

10             And another $45,000 worth of

11   income from your work with York College

12   and the SBA?

13             Now your answer.

14       A.    Plus or minus.

15       Q.    Why did you leave SOBRO?

16       A.    To join Fleet.  Actually, I was

17   recruited to join Fleet.

18       Q.    Who recruited you?

19       A.    Burnell Grear.

20       Q.    Who is Burnell Grear?

21       A.    Burnell was the SVP for Community

22   Investment Group at Fleet.

23       Q.    Is Burnell a man or a woman?

24       A.    Woman.

25       Q.    How is it that you came to know

43

```
 1              Cook
 2    Burnell?
 3        A.    She came into my office one
 4    evening.  Her --
 5        Q.    Which office?
 6        A.    One of her employees --
 7        Q.    Can I ask you which office?
 8        A.    The office at York College.
 9              One of her employees came into
10    the office at York College; we spoke.  She
11    came back with Burnell and Burnell offered
12    me a job.
13        Q.    What was the job that Burnell
14    offered you?
15        A.    Community investment officer
16    responsible for Queens and Long Island.
17        Q.    What did you do as the community
18    investment officer responsible for Queens
19    and Long Island?
20        A.    I identified organizations to
21    make recommendation to the bank to invest
22    in under the Community Re-investment Act.
23        Q.    Did you have a corporate title
24    when you joined Fleet?
25        A.    Vice president.
```

45

1            Cook

2      A.    Until 2003, I guess.

3      Q.    What happened in 2003?

4      A.    The merger with Bank of America.

5      Q.    So, I'm going to help you out

6 here.  I'll give you the effective date of

7 the merger.  It was April 1, 2004.

8            Did your position change before

9 the merger?

10     A.    My position was eliminated before

11 the merger.

12     Q.    And you think that was in 2003?

13     A.    Approximately around that time,

14 around 2003, 2004.  I don't remember

15 exactly.

16     Q.    Were you offered a severance?

17     A.    Yes, I was.

18     Q.    Did you accept the severance

19 offer?

20     A.    No, I was recruited by someone

21 else while I was out of the country.

22     Q.    You will have to explain that

23 answer.

24     A.    Okay.

25            My position was eliminated.  I

48

```
 1              Cook
 2   call from someone at Bank of America?
 3       A.    That is correct.
 4       Q.    And at this time, when you
 5   received the call from someone at Bank of
 6   America, had the merger taken place?
 7       A.    I don't remember.  Banks have
 8   customer day one, legal day one, name day
 9   one.  There was no, to my knowledge,
10   effective merger that had taken place.  I
11   don't know for me because I was at Fleet.
12   I really didn't pay attention to that stuff.
13       Q.    Give me again the name of the
14   individual who called you.
15       A.    Tom Winston.
16       Q.    You flew to Atlanta?
17       A.    Yes.
18       Q.    Had a meeting with Mr. Winston?
19       A.    Yes.
20       Q.    What position did he offer you?
21       A.    Regional manager in the
22   neighborhood lending wholesale mortgage.
23       Q.    Let me ask you about the position
24   that you had at Fleet.  Was that entire
25   unit laid off?
```

233614-Keith%20Cook-1

49

1                    Cook

2         A.    Yes.

3         Q.    Every one in community banking

4    was laid off?

5         A.    Except for Maurice, but all of

6    the community banking officers were laid

7    off.

8         Q.    Maurice who?

9         A.    Coleman.

10        Q.    What happened with Maurice

11   Coleman?

12        A.    He went to work in another area

13   somewhere, I don't know.

14        Q.    When did you start in

15   neighborhood lending wholesale mortgage?

16        A.    I guess it was -- I don't

17   remember when the first severance

18   occurred, but maybe a month, three weeks

19   after that.  I know I was out of the

20   country for a month and I returned; I

21   started with that job.

22        Q.    Could it have been around May of

23   2004?

24        A.    It could have been around there.

25              I think it was before then.  It

50

1              Cook

2    could have been -- actually, I don't

3    remember.  I remember it being in the

4    fall.

5        Q.    Of 2004?

6        A.    Approximately 2004.  2003 or

7    2004.

8        Q.    Was the elimination of the

9    community banking in anticipation of the

10   merger?

11       A.    I have no idea.  That was -- that

12   was a decision made way above my head.

13       Q.    So, again, your position was

14   regional marketing manager, was that your

15   position?

16       A.    Yes.

17       Q.    What did you do in that role?

18       A.    My job was to go out and build

19   relationships with wholesale mortgage

20   brokers for delivery of affordable

21   mortgage products in the states of -- it

22   started for me in New York through

23   Pennsylvania, then it became New England

24   and New York through Pennsylvania.

25       Q.    How long did you have that role?

53

1                    Cook

2    given some stock, restricted stock.

3        Q.    Do you know what the pay out on

4    the restricted stock was?

5        A.    You had to hold on to it for

6    three years, I think.

7        Q.    And you received the payment on

8    that then at some point?

9        A.    I'm sure I did.

10       Q.    In October of 2005 you were

11   offered another position but you declined

12   it?

13       A.    Yeah.

14       Q.    Were you then offered severance?

15       A.    I was then -- yeah.

16             What happens is you get this

17   package in the mail, as you can imagine,

18   and it says call this number and here's --

19   you've worked this years, here's the money

20   that you're entitled to.  That's

21   essentially what happened.

22       Q.    Did you sign that package?

23       A.    No, I did not.  To the best of my

24   memory, I don't think I did.

25       Q.    What happened next in terms of

54

```
 1              Cook
 2    your employment then?
 3        A.    I got a -- became the retail
 4    manager for retail mortgage.
 5        Q.    Was there a period of time when
 6    you had been terminated by the bank?
 7        A.    No, I was hired the next day in
 8    this role.  After getting that package, I
 9    think it was two days, Josh Diaz spoke to
10    me.  He had been the manager of this
11    failed office in New York which had a
12    series of repeated failed managers.  I
13    sent an e-mail to John Frazza at eleven
14    o'clock that night.  I believe I was hired
15    that next morning, but he had clearly
16    understood my track record.
17        Q.    John Frazza did?
18        A.    Yes.
19        Q.    And Josh Davis was the prior
20    manager?
21        A.    Josh Diaz.
22        Q.    Josh Diaz, sorry about that.
23              He was the prior manager for the
24    New York market?
25        A.    For about a month.  He came here,
```

55

```
 1              Cook

 2    the bank put him in a hotel, paid him a

 3    lot of money, and he quit because the job

 4    was too hard for him, according to him.

 5        Q.    Did you have a conversation with

 6    him about this?

 7        A.    Absolutely.  I met with him in a

 8    restaurant.

 9        Q.    When did that happen?

10        A.    I guess around October of 2005.

11        Q.    Is that how you learned that

12    there was an opening?

13        A.    Yes.

14        Q.    And then you e-mailed John Frazza?

15        A.    That evening after our dinner.

16        Q.    Did you then meet with John

17    Frazza?

18        A.    Yes, he asked me to catch a train

19    to Rhode Island I believe the next day.

20        Q.    Did you interview for the

21    position then?

22        A.    Yes, I did.

23              Well, interview . . .  that's a

24    hard word in our world of mortgage.  I was

25    offered the position.
```

56

Cook

Q.    Did he offer you the position

that day in Rhode Island?

A.    When I got to Rhode Island, yes.

Q.    Prior to him offering you the

position, did you and he have a

conversation about your qualifications for

the position?

A.    He had already known of them.

No.

Q.    So, what was the discussion that

you had with John Frazza that day in Rhode

Island as best you can recall?

A.    I need a manager -- as best I can

recall, I need a manager in this office.

It's one of the poorest performing offices

in the franchise.  Do you want the job?

Yes, I'll take it.

Q.    Where was the office physically

located at that time?

A.    60 Hempstead Avenue, West

Hempstead.

Q.    And what was the role that you

were offered?

A.    Manager, New York sales manager,

57

1              Cook

2    retail mortgage sales manager, New York

3    City and Long Island.

4        Q.    Were you still a vice president

5    at this time?

6        A.    That is correct.

7        Q.    What was your compensation that

8    you were offered in that role?

9        A.    I -- again, this is some time

10   ago, but I think the starting was a

11   commission, or some starting incentive of

12   12,000 a month for three months, and after

13   that you went to commission.

14           Can I get some water?

15           MS. SWEENEY:  Absolutely.  Do you

16       want to take a break?

17           THE WITNESS:  No, I'm fine.

18       Thank you for asking.

19           MS. SWEENEY:  Feel free to move

20       around.

21       Q.    When you say it was 12,000 for

22   three months, did you mean that that was

23   like a guaranteed draw?

24       A.    Guaranteed draw.

25       Q.    Then did you go on a recoverable

98

```
                    Cook
1
2       A.    That is correct.
3       Q.    Is there anything else that you
4   can recall of the first conversation that
5   you had with Mr. Thomas?
6       A.    No.
7       Q.    What is the next conversation
8   that you had with him?
9       A.    I explained that I had been a
10  sales manager at Bank of America, he had
11  my information, he knew of me.  He said he
12  would get back to me.
13      Q.    Is that all you can recall of the
14  second conversation that you had with Mr.
15  Thomas?
16      A.    That is all I can recall of the
17  second conversation.
18      Q.    I'm going to ask you again; let
19  me get my question out.
20      A.    I honestly don't remember.  I
21  can't tell when you're finished because of
22  your cadence.  I will wait for a pause.
23      Q.    I think that's a fine strategy.
24  Let's use that.
25            Did you then have a third
```

162

1              Cook

2      couldn't pinpoint a first thing, then you

3      went into these more general things.

4              Have you told me everything about

5      Sue that you can recall right now or are

6      these things that you recall from the

7      beginning of your relationship with her?

8              MS. BROWN:  Objection.  Are you

9          just asking for a narrative of his

10         entire experience?

11             MS. SWEENEY:  No, I'm not.  I'm

12         trying to figure out what it is he just

13         testified about.

14     A.    Well, I never said that I

15     couldn't pinpoint it.

16     Q.    Okay, so what is the first thing

17     that you claim was race discrimination or

18     retaliation?

19     A.     Being brought in to meetings that

20     no other manager had to go through and

21     every time, from the moment Sue arrived,

22     my discussions with her had a tribunal,

23     with John on the phone, Margarite on the

24     phone, or HR or Advice & Counsel on the

25     phone; there was never a direct discussion

163

                    Cook

1

2   about my performance.  It was always a

3   disciplinary action or tone that came

4   unfounded, unwarranted and was disparate.

5   You have documents.  I mean, I'm sure I

6   have stacks of e-mails on them.

7       Q.    When was the first time?

8       A.    Upon her arrival, slightly after

9   her arrival, when I found myself being

10  instructed no longer to coach my team, who

11  I had historically coached to success.

12  You are not to be in this meeting coaching

13  your team.

14      Q.    When did that happen?

15      A.    Approximately 2006, 2007.  I

16  don't know.  You'd have to look at some of

17  the documents I've submitted.

18      Q.    That you have submitted?

19      A.    Yes.

20      Q.    So, you think you submitted a

21  document that would tell us when it is

22  that Sue Cole --

23      A.    I'm sure I have.

24      Q.    Let me finsih my question.

25            -- Sue Cole told you not to

164

1              Cook

2    attend meetings with your team?

3         A.    I'm quite sure I have, yes.

4         Q.    And, in fact, told you not to

5    coach your team?

6         A.    Yes.   Specifically on a Sony-Ma

7    training, yeah.   That's when it first

8    started.

9         Q.    Do you claim that was race

10   discrimination?

11        A.    I claim that was race discrimination,

12   yes.

13        Q.    Do you claim that was retaliation?

14        A.    I claim that was race

15   discrimination, not retaliation at that

16   point.

17        Q.    At the time that it happened did

18   you think it was race discrimination?

19        A.    I thought it was -- I thought

20   that it was unique and unusual and not

21   something that my peers were experiencing.

22        Q.    Did you understand my question?

23        A.    Yes, I did.

24        Q.    So, is that a no?

25        A.    That is -- I think it was

165

1                    Cook

2     disparate.

3          Q.    Did you think it was

4     discrimination?

5          A.    Yes, I did.

6          Q.    Based on your race?

7          A.    Yes, I did.

8          Q.    You said your peers were not

9     subject to the same treatment; correct?

10         A.    That is correct.

11         Q.    Which peers are those?

12         A.    The sales managers who reported

13    to her.

14         Q.    Who is that?

15         A.    Mike DiDonna, Cheryl Davis, Darcy

16    Gore, Derrick Sawyer.  That's all I can

17    remember right now.  There were others as

18    well, yeah.

19         Q.    How do you know that those

20    individuals were not asked to do the same

21    thing that you were asked to do?

22         A.    Because I would ask them.

23         Q.    To whom did you speak?

24         A.    All of them.

25         Q.    You spoke with each one of those

1              Cook

2        Q.    You have a memory as you sit here

3    today of having spoken with Darcy about

4    this?

5        A.    Yes.

6        Q.    And speaking with her at the

7    time?

8        A.    Yes.

9        Q.    Did you ever speak to Sue to find

10   out why it was that she did not want you

11   to manage or train your team on the

12   Sony-Ma training?

13       A.    Yes, I did.

14       Q.    Did you do that before or after

15   the training?

16       A.    In an e-mail, I did it before the

17   training.

18       Q.    As best you can recall, what did

19   you say?

20       A.    Why is it that I can't train my

21   team when I've been responsible for

22   creating the bond loan agreements with the

23   New Jersey Housing Authority and the State

24   of New York Mortgage Authority on this

25   product?  And there was no response.

169

1                    Cook

2          Q.    You received no response?

3          A.    I received no response.

4          Q.    Did you complain to anyone at

5     Bank of America about this issue at this

6     time?

7          A.    John.

8          Q.    What did you say to John?

9          A.    Why is it that I'm not able to

10    train my team on this particular subject

11    or this particular product or set of

12    products?

13         Q.    Again, was that in an e-mail or

14    did you have a conversation --

15         A.    That was in an e-mail.

16         Q.    What, if anything, did John

17    respond to you?

18              MS. BROWN:  Are we referring to

19         John Frazza?

20         Q.    Are we referring to John Frazza?

21         A.    Yes, we are.  He said Sue will be

22    conducting these meetings.

23         Q.    Do you know whether Sue, in fact,

24    conducted the meeting?

25         A.    The meeting never occurred.  The

171

1                    Cook

2       A.    That specific product or that

3   product is specific to the State of New

4   York.  These peers were in other states,

5   so they would have been conducting

6   training on a variety of other issues.

7       Q.    Well, at least some of these

8   people were in New York; correct?

9       A.    Uh-hum.

10      Q.    Who had Upstate New York?

11      A.    Mike DiDonna.  No, definitely he

12  was not, nor Kevin Horan.  They survived

13  on Sony-Ma.  They were not instructed not

14  to conduct training.

15      Q.    Your knowledge of that comes from

16  what?

17      A.    Speaking with them.

18      Q.    You asked them --

19      A.    I was instructed to contact

20  Mike's assistant and schedule for her to

21  teach or to get with Mike to teach this

22  program, despite the fact that I had

23  already taught it once.

24      Q.    Who told you to get with Mike to

25  teach the program?

1              Cook

2        A.    Sue and John.

3        Q.    Sue and John told you to do that?

4        A.    Yes.

5        Q.    And this is Mike DiDonna?

6        A.    Yes.

7        Q.    Did you and Mike DiDonna ever

8   teach the program?

9        A.    No, actually, it was instructed

10  with Gail Kresge from Sony-Ma.

11       Q.    Did Mike DiDonna ever, as far as

12  you know, conduct the program on his own?

13       A.    Yes, he did.

14       Q.    When was that?

15       A.    Regularly.  Sony-Ma training, it

16  was a regular curriculum, it was an

17  essential product.  And Kevin Horan as

18  well.

19       Q.    I'm confused by your testimony,

20  so I'm going to ask you and, hopefully, we

21  can get that clarified.

22             Are you testifying that somebody

23  from Sony-Ma came in and trained your team

24  but did not train other teams?

25       A.    They trained my team, yes.  They

Cook

1
2   may have trained other teams, I don't
3   know.
4       Q.    And you believe that Mike DiDonna
5   and Kevin Horan also trained their teams?
6       A.    Yes.
7       Q.    On their own?
8       A.    Yes.
9       Q.    At some point Sue and John told
10  you to get together with Mike DiDonna to
11  do training of whose team?
12      A.    My team.
13      Q.    Of your team?
14      A.    Yes.
15      Q.    But that training never occurred?
16      A.    No.
17      Q.    Why did that training not occur?
18      A.    It was cancelled by John.
19      Q.    Do you know why?
20      A.    I have no idea why.
21      Q.    Do you believe John's conduct
22  with respect to this training was
23  discriminatory against you because of your
24  race?
25      A.    Yes, I do.

174

Cook

2    Q.    Why do you believe that?

3    A.    Because I had previously helped --

worked with Bank of America to establish

the agreement with both bond loan -- three

bond loan agencies in three states; New

York, New Jersey and Pennsylvania,

independent of each other, in Trenton and

in -- here in Manhattan, as well as in

Philadelphia.  I was competent in the

area.  I had already conducted this

training with my team immediately after

assuming the role as mortgage sales

manager, so it was odd to me that suddenly

I was not able to teach my team something

that I was fluent in and understood, and

was instructed to find someone else to

assist me to do that without any evidence

that there had been a deficiency in my

team's performance in this area.

Q.    Is that the entire basis of why

you believe that was race discrimination

from John Frazza?

A.    For that specific incident, yes.

Q.    What is the next incident that

177

1              Cook

2      A.    No.

3      Q.    You said in between the Sony-Ma

4  training issue and what you said to me

5  originally in your answer as the next

6  issue, which I think you described as

7  restricted in your hiring practices, you

8  said that there were incidents of

9  retaliation?

10     A.    Yes.

11     Q.    So, let's talk about those.   In

12 between these two things, the Sony-Ma

13 that's the first incident that you recall

14 of race discrimination, and the second

15 incident that you recall as being

16 restricted in your hiring practices.

17     A.    Yes.

18     Q.    In between those two incidents,

19 you claim that there was some retaliation?

20     A.    Yes.

21     Q.    What was the retaliation?

22     A.    I understood that I had the

23 responsibility for a very large area and

24 that the organization had the need to

25 grow.  A sales team is cultivated.  While

178

1              Cook

2   away on vacation, I came back and

3   discovered that a portion of my territory

4   was going to be severed, which was fine.

5   I'm an employee of the organization, and I

6   explained to my team the need for growth

7   in our organization and that many of them

8   would be given the opportunity to move

9   into other areas.  After I came back and

10  learned that this was already in process,

11  this dismantling of the team.  Then my

12  team was instructed to go and work for --

13  with someone else, which is unusual.

14             We attend sales meetings.  Much

15  like a coach of any team, you develop a

16  culture, a work ethnic, a rhythm with your

17  team to success.  They did not want to go

18  to work for anyone else and they refused.

19  In a conversation with Sue, listening to

20  her on the phone, she is telling John that

21  they refused because I said something to

22  them, I did something.  I don't have the

23  power of hypnosis.  These individuals

24  decided that they wanted to remain with

25  their manager.  Following that event there

179

1               Cook

2    was a series of retaliatory events that

3    occurred.

4         Q.    Let's break that down.  I asked

5    you what the retaliation was and you

6    described to me that you had gone on

7    vacation, you came back and you learned

8    that a portion of your territory was going

9    to be severed and you were fine with that,

10   you understood that you were an employee --

11        A.    Absolutely.

12        Q.    Are you claiming that the

13   severance of that territory from your

14   management was retaliatory or

15   discrimination?

16        A.    I'm claiming that when my team

17   refused to --

18        Q.    I want you to concentrate on --

19        A.    No, that's not retaliation, no.

20   No.  It's odd.

21        Q.    What territory was that?

22        A.    Long Island.

23        Q.    So, this was sometime in 2007, am

24   I correct?

25        A.    I think 2007.

181

1                    Cook

2        A.    There is not a manager I spoke

3    to, specifically the number one manager in

4    the Bank of America franchise, Dick Koch,

5    who explained that he has never heard of

6    that before.  His comments, again to

7    paraphrase, were that the institution

8    sends us to Las Vegas to develop this

9    environment of camaraderie and team

10   development.  I've never heard of a team

11   being severed before.  He said that's

12   unusual, highly irregular.

13       Q.    Was it your entire team that was

14   being told to move to the new team?

15       A.    It was half of my team.

16       Q.    Which half?

17       A.    Those who -- what was said to

18   that team -- and I can't divide the team,

19   anyone who had a bank branch supporting

20   them or who supported a bank branch on

21   Long Island.

22       Q.    So, as I understand it, the

23   mortgage loan officers got referrals from

24   the bank branches; correct?

25       A.    About 50 percent of their

1               Cook

2  business.

3       Q.    So, if they had bank branches in

4  this Long Island territory that provided

5  them with referrals, they were being asked

6  to join the Long Island team?

7       A.    Right.

8       Q.    And, so, you can't identify who

9  that was at this time?

10      A.    Anyone who had -- no, I can't,

11  there were so many people at that time.   I

12  had 40 people working for me at that time.

13      Q.    How many people actually

14  transferred to this new territory?

15      A.    One.

16      Q.    Who was that?

17      A.    John Pi.

18      Q.    With respect to the others who

19  didn't, why is it that they did not

20  transfer?

21      A.    Loyalty to their manager.

22      Q.    Were they given an option to

23  transfer?

24      A.    They were given an ultimatum to

25  transfer.

183

1              Cook

2      Q.     But you told me they didn't

3   transfer?

4      A.     No, they did not.

5      Q.     How did that transpire?

6      A.     They, to the best of my memory or

7   recall, wrote letters saying you can keep

8   the bank branches, I don't wish to

9   transfer.

10     Q.     Can you identify any of them that

11  did that?

12     A.     Providence Aiossa, who was the

13  largest producer at the time, and her team

14  and a series of other people.  Again,

15  Siobahn, there were 40 people at that time

16  who reported to me.

17     Q.     A mortgage loan officer works

18  often with a team; those 40 people, does

19  that include that team or are you saying

20  you had 40 mortgage loan officers?

21     A.     I had 40 mortgage loan officers,

22  approximately, 35 to 40, including staff,

23  assistants and everyone else.

24     Q.     So, that includes all that?

25     A.     Yes.

184

1                  Cook

2       Q.    So, it's a total of all --

3       A.    Well, loan officers, there were

4    maybe -- staff there were probably about

5    three administrative assistants, so maybe

6    about -- I'll pick a number and say 32

7    people.

8       Q.    Is there anyone other than

9    Providence that you recall today as you --

10      A.    Deidre Collins.

11      Q.    I'm sorry, I have to get the

12   question on the record.

13      A.    I've got to get your cadence

14   down.

15      Q.    Is there anyone other than

16   Providence that you recall today who wrote

17   a letter or refused to move to the Long

18   Island team?

19      A.    All of the loan officers who were

20   asked who had branches on Long Island

21   declined to move.

22      Q.    I'm asking if you recall any

23   specific individuals.

24      A.    No, I don't remember.

25      Q.    Providence Aiossa is the one that

185

1               Cook

2   you specifically recall?

3       A.   Yes.

4           MS. BROWN:  I think he also

5       testified about Deidre Collins.

6       Q.   Is that true?

7       A.   Deidre Collins.

8       Q.   Anyone else?

9       A.   Anyone who had branches at that

10  time.

11      Q.   Anyone that you can recall their

12  actual name?

13      A.   Rick Mercado, Hughroy Daily.  The

14  list goes on.  I have to look at a list.

15      Q.   Each of these individuals was

16  told to move to the Long Island territory

17  and refused to do it?

18      A.   Yes.

19      Q.   Do you know whether any of them

20  at that time suffered any consequences as

21  a result of refusal?

22      A.   Providence Aiossa.

23      Q.   And what, at that time, was the

24  consequence that Providence suffered?

25      A.   Suddenly investigations on

186

1                    Cook

2    Providence began to pop up regarding

3    allegations of fraud.

4        Q.    And do you have any idea how

5    those investigations started, what

6    prompted them?

7        A.    Word, request; those are the

8    ideas I have.  It's easy to initiate an

9    investigation.

10       Q.    Do you have any knowledge of what

11   prompted those investigation?

12       A.    No, I do not.  Neither did

13   corporate security.

14       Q.    Do you agree that Bank of America

15   has an obligation to investigate any

16   allegations of fraud?

17       A.    Absolutely.

18       Q.    Regardless of the source of the

19   allegations?

20       A.    I agree with that.

21       Q.    So, you told me that this you

22   believe was race discrimination; correct?

23       A.    Yes, I do.

24       Q.    Have you told me all of the

25   reasons why you believe that this was race

189

```
1                    Cook

2        Q.    How is it that you learned of the

3   conversations?

4        A.    My team members called me and

5   said why is it that I was asked to come

6   into a meeting with Sue and told that I

7   don't have a choice, that I'm transferring

8   to another team.

9        Q.    Who told you that's what

10  occurred?

11       A.    Buddy Naipaul, Carlos Herman,

12  Carolina Encarnacion, Karene Lenavenec,

13  Richard Pagan, Allen Lee, Tony Choy,

14  Denise Lott.

15       Q.    Did you hear that from anyone

16  else?

17       A.    None that I can recall now.

18  There were others, but none that I recall.

19       Q.    And tell me how that is

20  retaliation against you.

21            MS. BROWN:  I'm going to object

22       to the extent that calls for a legal

23       conclusion.

24            MS. SWEENEY:  I'm asking for his

25       belief.
```

1              Cook

2    tell me the entire factual basis for your

3    belief that this incident was retaliation

4    against you?

5         A.    That particular incident.

6         Q.    Yes, that particular incident.

7         A.    Yes, and the -- yes.

8         Q.    Is this the first incident of

9    retaliation that you're claiming in this

10   lawsuit?

11        A.    No, there were others.  There was

12   a series of others.

13        Q.    So, what happened prior to this

14   that you are claiming was retaliation,

15   keeping in mind this incident occurred in

16   or around January of 2008.

17        A.    Prior to that I mentioned -- I

18   wasn't particularly dedicated to becoming

19   an SVP.  I didn't care.  I was a mortgage

20   salesperson comfortably compensated.  I

21   asked about it, observed the criteria for

22   it, met the criteria for it and I was told

23   no.  Which was number of employees you

24   managed, XYZ, and there's a printed form.

25   I was away on vacation working on a

1          Cook

2     project along with our real estate

3     development unit, participating in

4     conference calls with the national sales

5     executive utilizing the bank's wireless

6     system, where it's clear I'm away on

7     vacation, 40 hours on vacation working.

8     At that time there's a phone bill, which I

9     need to access this wireless activity for

10    this critical event.  The phone bill comes

11    in and I'm told you have to pay for it.

12          I mean, I'm going to let you go

13    on because these events, we can go on and

14    on.

15          My assistant, being met with the

16    in the morning -- and we clearly as

17    professionals understand that your

18    administrative assistant is your

19    heartbeat, being told in the morning that

20    you're going to work for someone else.

21    Q.    Are there any other incidents of

22    retaliation that you claim occurred prior

23    to January 2008 when your team -- or

24    members of your team, were asked to move

25    to a Manhattan team?

195

Cook

2      A.      No, fluorescent lights, they

3   bother me.

4      Q.      Let me ask you this; what is the

5   basis of your belief that you were not

6   made an SVP as an act of retaliation

7   against you?

8      A.      That was an act of

9   discrimination.

10      Q.      Was it an act of retaliation?

11      A.      That was an act of

12   discrimination.

13      Q.      So, this was race discrimination?

14      A.      Yes.

15      Q.      What makes you believe that you

16   were not made a senior vice president

17   because of race discrimination?

18      A.      I had met all of the criteria.

19      Q.      Are there any other reasons?

20      A.      No.

21      Q.      What reasons were you given at

22   the time, if any?

23      A.      I wasn't given an answer to my

24   question at all.

25      Q.      You had no answer at all?

196

1            Cook

2      A.    No.

3      Q.    Who was it as far as you know who

4  made that decision?

5      A.    It was John.  I sent an e-mail to

6  both, I believe.

7      Q.    But do you know who made the

8  decision?

9      A.    It was John Frazza.

10     Q.    Were any of your peers, as far as

11 you know, senior vice president?

12     A.    Darcy Gore.

13     Q.    Anyone else?

14     A.    No, I don't think they asked.  I

15 don't think they did.

16     Q.    And when did you ask to become a

17 senior vice president?

18     A.    I don't remember the times.

19     Q.    Did you have any conversations

20 with Sue Cole on this issue?

21     A.    I did.

22     Q.    What were your communications

23 with Sue Cole as best you can recall?

24     A.    I'm sure I sent an e-mail asking

25 and here is the criteria for it.

197

1                Cook

2     Q.    So, you think you looked up the

3  criteria?

4     A.    Yes, I looked up the criteria and

5  I sent a copy of it to her and to John,

6  because it would have been his call.  And

7  there was no additional money assigned to

8  it; I met the criteria.

9     Q.    Are you aware of anyone else who

10  requested to be a senior vice president

11  but who was denied?

12     A.    Cheryl Davis.

13     Q.    Anyone else?

14     A.    No.

15     Q.    When did Cheryl Davis request

16  that?

17     A.    I don't know.  Cheryl, I guess,

18  requested it a few months earlier.

19     Q.    Do you know why Cheryl's request

20  was denied?

21     A.    I couldn't speculate.

22     Q.    Do you know who made the decision

23  with respect to Cheryl's request?

24     A.    John Frazza.

25     Q.    Is there anyone else who

198

```
1                    Cook

2    requested to be a senior vice president

3    but was denied?

4         A.    No.

5         Q.    Are you aware of anyone who

6    requested to be become a senior vice

7    president and was permitted to do that?

8         A.    Darcy.

9         Q.    Do you believe that Darcy

10   requested that or was that something that

11   was bestowed?

12        A.    She requested it.

13        Q.    How do you know that she

14   requested it?

15        A.    She told me.

16        Q.    When did she request it?

17        A.    I don't know.

18        Q.    Do you know who made the decision

19   with respect to that?

20        A.    John.

21        Q.    Are you aware of anyone else who

22   requested to be a senior vice president

23   and was permitted to do that?

24        A.    No.

25        Q.    Prior to these incidents of
```

199

1              Cook

2    retaliation that you have testified about,

3    had you made any complaint of race

4    discrimination?

5         A.    Prior to that, no.

6         Q.    And that would be prior to the

7    December/January time frame when all of

8    these incidents occurred, according to

9    you?

10        A.    No, no, I had not.

11        Q.    So, you said that you were denied

12   payment for your phone bill while you were

13   on vacation; correct?

14        A.    Yes, a $3,000 phone bill.

15        Q.    Was any portion of that paid by

16   the bank?

17        A.    Generally, all of it was paid by

18   the bank.

19        Q.    In this instance was any of it

20   actually paid by the bank?

21        A.    No.

22        Q.    What makes you believe that this

23   is retaliation against you?

24        A.    Because the phone -- I asked for

25   it to be paid, simply because -- it wasn't

201

1              Cook

2     discussed with me, when ironically the

3     entire industry knew who the person was.

4              Which events?  A person coming in

5     and interviewing and then being told, you

6     know what, you're going -- we're bringing

7     you into the bank, you're going to work

8     for Keith, and then they get an offer

9     letter that says you're going to work for

10    someone who hasn't come here yet.

11             So, there are a series of events,

12    Siobhan.  I'm sure you've got a stack of

13    these things.

14       Q.    What my question was is why do

15    you believe that the bill for you using

16    this wireless card during your vacation,

17    not being paid by the bank, so it wasn't

18    reimbursed to you by the bank, why do you

19    believe that was retaliation?

20       A.    Because the group of people who

21    were asked to transfer refused to transfer

22    a second time.

23       Q.    So, you think this was in

24    retaliation for their refusal to transfer?

25       A.    Yes.

1              Cook

2      Q.    Was it in retaliation for

3  anything else?

4      A.    No.

5      Q.    Do you believe that you not being

6  a senior vice president was in retaliation

7  for your team's refusal to transfer?

8      A.    I believe that was racial

9  discrimination.  No, I don't.

10     Q.    You're right, you did tell me you

11 thought it was race discrimination.   I

12 think originally we talked about it and

13 you said retaliation and you changed that.

14          So, then, the next thing you said

15 that was retaliation was your assistant

16 was told that she was going to work for

17 someone else?

18     A.    Yes.

19     Q.    What was that in retaliation for?

20     A.    To take away my admin who was

21 responsible --

22     Q.    Was this again in --

23     A.    That was in retaliation.

24     Q.    It was in retaliation for your

25 team refusing to transfer to another

203

1               Cook

2   manager?

3       A.    Yes.

4       Q.    Was it in retaliation for

5   anything else?

6       A.    I don't know.  It could have been

7   retaliation -- Siobhan, give me the

8   question again; I want to answer it.

9       Q.    I'm going to state it in a

10  different form.

11              Do you believe that that was in

12  retaliation for anything other than your

13  team refusing to transfer?

14      A.    Yes.

15      Q.    What do you believe it was in

16  retaliation for?

17      A.    I believe it was in retaliation

18  for my writing a letter to the senior

19  leadership team asking why I was being

20  discriminated against in this way, why I

21  was experiencing patterns that no other

22  manager was experiencing.  It was in

23  retaliation for my writing that letter and

24  not cc'ing or including my managers, after

25  this behavior of lying to a group of

204

1                    Cook

2   people and telling them that I didn't tell

3   you that you were transferring.  That's

4   what I believe it was in retaliation for.

5        Q.    Is there anything else that you

6   believe it was in retaliation for?

7        A.    No.

8        Q.    Were there any other incidents of

9   retaliation, other than these that you

10  have testified about that occurred in that

11  late December, early -- late December

12  2007, early 2008 time period?

13       A.    None that I can remember, other

14  than -- one second.  I think there was a

15  team meeting in Boston, if I remember that

16  time period, January, a sales manager

17  meeting in Boston.

18            And as we're sitting here,

19  someone walks in, the chairs are filled

20  with sales managers as they are at this

21  conference table, and they look at you and

22  say anyone who knows me -- and I imagine

23  that's January, okay, I believe it's

24  January.  Anyone who knows me knows that

25  anyone who opposes me is not long for my

```
 1              Cook
 2    world.  And then you have heads in the
 3    room turn and look at you, because the
 4    person is looking at you.
 5         Q.    Who is the person talking and
 6    saying that?
 7         A.    John Frazza.
 8         Q.    Who turned their heads?  Can you
 9    name anyone specifically?
10         A.    Mike DiDonna, Cheryl, Derrick
11    Sawyer, Rob Franklin, Mary Ruth Ryan.
12         Q.    Anyone else?
13         A.    Those are the names that just
14    come to me, that I see their faces that
15    turned when they looked at me, because I
16    was sitting at the end of the table.
17         Q.    Did you turn and look at anyone?
18         A.    I turned and looked at all of
19    them because they were turning and looking
20    at me.  I was sitting at the end of the
21    table, so I didn't really have to turn.
22    The person was standing on the opposite
23    side of the table.  I might have been
24    sitting where -- I'm sorry, what's your name?
25              MS. SWEENEY:  Michele.
```

206

1                   Cook

2       Q.    So, you were at one end of the

3   table and he was at the other end of the

4   table?

5       A.    Yes.

6       Q.    And, as he said this, his eyes

7   were on you?

8       A.    Yes.

9       Q.    Other people looked?

10      A.    Yes.

11      Q.    And you looked at other people?

12      A.    Yes.

13      Q.    How many people were at this

14  meeting?

15      A.    Let's say 15 plus.

16      Q.    Were they on Sue's team or

17  anybody else's team?

18      A.    The New England team and the

19  Metro New York team.

20      Q.    So, there were people from

21  Connecticut?

22      A.    Yes.

23      Q.    There were people from Rhode

24  Island, Massachusetts?

25      A.    Yes, absolutely.

207

```
1                    Cook

2        Q.    Did John Frazza say your name

3    when he said that?

4        A.    Nope.

5        Q.    So, he didn't make any reference

6    to you specifically?

7        A.    Nope.

8        Q.    In his words?

9        A.    Nope.

10       Q.    The reason that you believe it's

11   retaliation is why?

12       A.    Again, because the team had

13   refused to transfer along, and at some

14   point -- again, Siobhan, these dates are

15   not something that I walk around thinking

16   about every day.  In fact, I try to put it

17   out of my mind.

18            John had come to New York to

19   reinforce the fact that there was the need

20   for growth and for people to move and they

21   had declined in that meeting or after that

22   meeting.

23       Q.    So, was John the individual who

24   met with these people?

25       A.    Sue Cole.
```

209

                    Cook

1

2       So, she said I was off message; he said

3       that I was off message.

4           Q.    Let's go back so we have some

5       clarity on this issue, because it keeps

6       coming up.  So, let's just go through it.

7               When was the first time that you

8       learned that the bank was going to

9       establish a Manhattan branch separate and

10      apart from the other four boroughs?

11          A.    When my team told me they had

12      meetings without me.  I'm sorry, I want to

13      take that back.  When I walked into a

14      senior leadership meeting and the admin

15      for -- who'd done planning for the floor,

16      told me I had a request for an additional

17      25 seats on a floor that had no space.

18          Q.    That is for a location in

19      Manhattan?

20          A.    That is for a location in

21      Manhattan, yes.

22          Q.    Who was the admin?

23          A.    Cathy Mendelson.  She worked for

24      Jim.

25          Q.    Jim who?

210

Cook

A.    Hedden.

Q.    Do you recall when that was?  Was it around January?

A.    It was around that time. January, February, around that time.

Q.    What, if anything, did you do when you learned that there was a request for 25 seats?

A.    I sent John an e-mail.

Q.    What did John say?

A.    He called me.  He said it was an oversight, that there were growth plans. He should have told me.

Q.    So, this is the first time that you're learning of this plan?

A.    That, and -- that was the first time, yes.

Q.    Did you have any meetings with John in Providence, Rhode Island, related to this plan for the New York market?

A.    That meeting, yes, I did.

Q.    When did that occur?

A.    That occurred the same day as the sales meeting, prior to his comment anyone

212

```
1              Cook

2    with the team, and then -- I'd say

3    three-and-a-half was the meeting in Rhode

4    Island where I was taken into a separate

5    room with John and Sue and given a list of

6    my top performers and told all -- all of

7    my top performers, and told they were

8    going to be reassigned someplace else.

9         Q.    Let's take it one step at a time.

10        A.    Absolutely.

11        Q.    I think we are at the first

12   communication you had about this, John

13   said he's sorry, it was an oversight.

14   What is the next thing that happens as you

15   can recall?

16        A.    I get a call from someone

17   explaining there is a posting for a

18   Manhattan sales manager.

19        Q.    Who was that someone?  From now

20   on, can you try to be -- so I don't have

21   to ask so many questions about who it was,

22   if you recall somebody's name, please

23   state what the name is in your response.

24        A.    I'll do that.

25        Q.    Who was the person who you
```

218

Cook

1

2     Q.    Did you ever see the posting for

3     that position?

4     A.    Never saw it.

5     Q.    So, you hear from Jeff Barker and

6     then what's the next thing that happens?

7     A.    I sent an e-mail to John Frazza

8     and asked about it.

9     Q.    What did he say?

10    A.    That was an oversight also.

11    Q.    Was that in an e-mail to you?

12    A.    That was in a discussion and an

13    e-mail, as well.  That was in an e-mail as

14    well.

15    Q.    What, if anything, happened next?

16    A.    Nothing.  I went to work, did my

17    job.

18    Q.    Was there any more contact

19    between you and anyone on this issue of

20    having a new branch manager in Manhattan?

21    A.    No, not that I can remember.

22    Q.    So, you never had any more

23    contact with John or Sue about this?

24    A.    I wouldn't say never.  I would

25    say not that I can remember.