UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

KEITH COOK,

                           Plaintiff,

-against-

BANK OF AMERICA & CO., JOHN
FRAZZA, SUSAN COLE,

                           Defendants.
------------------------------------------------------X

Case No. 09-CV-8039 (JSR)

**PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Plaintiff, Keith Cook, by his attorneys, THE COCHRAN FIRM, submits this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Plaintiff is an African-American man who was a top performer in the Consumer Real Estate division of Bank of America. As a vice president and branch manager, he led a team of some of the most successful, top-producing mortgage loan officers in the country. He was well-regarded by his peers in the industry, and his team considered him to be an excellent, always accessible, inspiring manager. In spite of his hard work and unchallenged ethics, Mr. Cook was subjected to race discrimination and retaliation by Defendant Bank of America through the conduct of his immediate managers, Defendants Sue Cole and John Frazza.

Defendant Sue Cole referred to Mr. Cook as a **"fucking nigger,"** demonstrating that her racial animus permeated all of her conduct toward him. Her manager, Defendant Frazza, condoned and participated in the discriminatory and retaliatory treatment by ignoring Mr. Cook's complaints and promoting Defendant Cole. The Defendants treated Mr. Cook differently than his similarly-situated white colleagues by constantly undermining him, excluding him from

meetings with his direct reports and poaching his team of its top performers in order to reassign them to his white colleagues.

After Mr. Cook complained about the discriminatory and hostile treatment, he was continuously retaliated against by Defendants with unwarranted discipline, bogus investigations by Bank of America's corporate security and advice and counsel departments, and finally wrongfully terminated.

## FACTS

Keith Cook became a Bank of America Branch Manager in 2005. He was very articulate, very smart, very knowledgeable, and very easy to speak to. (Exhibit 1, P. 12, L. 5-10.) He was a fabulous manager. (Id. at 22.)  Throughout his tenure, Mr. Cook was one of the highest paid in the organization (Exhibit 3 at P. 54, L. 12-17.)  His pay was predicated on his performance and productivity. (Id. at P. 52, L. 25 through P. 53, L. 11.)  Initially, Mr. Cook reported to John Frazza. (Id. at P. 55, L. 21-23.)  Unfortunately, in 2006, he was directly supervised by Sue Cole. (Id., L. 24 through P. 56, L. 6.)

From the outset of their existence together, Mr. Cook regarded Sue Cole as a racist. (Cook dep. at P. 162, L. 16-23, P. 163, L. 4-20, P. 357, L. 4 through P. 363, L. 21.)  He was correct in his assessment as Sue Cole referred to him as a "fucking nigger" behind his back. (Exhibit 1, P. 54, L. 5 through P. 55, L. 7.)  Cole also stopped Mr. Cook from providing his sales team training. (Cook dep. at P. 357, L. 4 through P. 363, L. 21.)

In addition, Cole and Frazza denied Mr. Cook's request for promotion to Sr. Vice President from Vice President despite the fact that he met the criteria for the promotion. (Exhibit 9.)  With regard to the promotion, Cole claimed that she supported it but Frazza denied the request. (Exhibit 6 at P. 128, L. 25 through P. 129, L. 17.)  Frazza, on the other hand, testified

that Cole made the decision by not recommending Mr. Cook for the promotion. (Exhibit 3, P. 73, L. 25 through P. 75, L. 3.)

Cole and Frazza both knew that Mr. Cook made more money than they did. (Exhibit 3, P. 53, L. 12-16.)  In fact, Cole and Frazza spoke about that fact at or near the time that both Cole and Frazza developed a plan that adversely impacted Mr. Cook's earnings. (Id. at P. 50, L. 2-9.) The plan involved splitting Mr. Cook's territory, bringing in new branch managers to manage the territory, and reassigning all of Mr. Cook's top earning Mortgage Loan Officers. (See Plaintiff's Rule 56.1 Statement in Opposition at paragraphs 14, 15, 16 and 17.)  The effect of this plan had the adverse impact of reducing Mr. Cook's earnings. (Id.)  As part of this plan Sue Cole also tried to redirect a potentially high-volume earner, James Dorceley, to whom Mr. Cook had extended an offer of employment, to a white branch manager. (See Plaintiff's Rule 56.1 Statement in Opposition at paragraphs 56-58.)  Cole took away Mr. Cook's office and tried to take away his sales assistant. (Id.)

These actions drove Mr. Cook to make a complaint of racial discrimination to Frazza's supervisors on January 31, 2008. (See Plaintiff's Rule 56.1 Statement in Opposition at paragraphs 59-62.)  There can be no dispute that the complaint was treated as one of racial discrimination since the Bank investigated the claim by interviewing John Frazza about racial discrimination regarding Keith Cook in February 2008. (Exhibit 3, P. 228, L. 22 through P. 229, L. 5.)

Prior to January 2008, Mr. Cook had never been the subject of a complaint at work and had never been disciplined. However, following the January 2008 complaint, about ten or eleven complaints came against Mr. Cook, one right after the other. (Exhibit 2, P. 282, L. 2 through P. 283, L. 19.)

The complaints against Mr. Cook were investigated by a division of Bank of America known as Advice and Counsel. Advice and Counsel's function was to minimize risk to the Bank of losing a lawsuit based on discrimination and retaliation. (Exhibit 2, P. 231, L. 11 through P. 233, L. 17.) In this capacity, Advice and Counsel advised Mr. Cook's managers how to go about minimizing the Bank's risks with regard to his complaints. (Id.)   Advice and Counsel in conjunction with Bank of America in-house legal counsel developed scripts, wrote and drafted emails for Frazza and Cole, and controlled all security investigations into Mr. Cook. (See Plaintiff's 56.1 Statement in Opposition at paragraphs 8-9, 69-91, 95-99.)

Ultimately Mr. Cook was fired in March 2009 for completely pretextual reasons. The real basis for his termination was the racial discrimination of Frazza and Cole and to increase the Bank's chance of defeating Mr. Cook in a lawsuit.

## ARGUMENT

### I.      SUMMARY JUDGMENT SHOULD BE DENIED AS THERE ARE NUMEROUS GENUINE ISSUES OF MATERIAL FACT

It is well-established that "summary judgment is a drastic remedy which should not be granted lightly. If there is any doubt as to the existence of a triable issue of fact, summary judgment must be denied." 113-114 Owners Corp v. Gertz, 123 A.D.2d 850, 507 N.Y.S.2d 464 (2nd Dep't 1986); see also, Coley v. Michelin Tire Corporation, 99 A.D.2d 795, 472 N.Y.S.2d 125 (2nd Dep't 1984); Sacks v. Weiss, 122 A.D.2d 937, 505 N.Y.S.2d 966 (2nd Dep't 1986); Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 325 (1986), and Levine v. Orion Limited Partnership, 195 A.D.2d 594, 602 N.Y.S.2d 544 (2nd Dep't 1993). It is also well-settled that the "proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the

4

case...Failure to make such showing requires denial of the motion, regardless of the sufficiency of the opposing papers..." <u>Winegrad v. New York Univ. Med. Center</u>, 64 N.Y.2d 851, 853, 487 N.Y.S.2d 316, 318, 476 N.E.2d 642 (1985); <u>see also</u>, <u>Elzer v. Nassau County</u>, 111 A.D.2d 212, 213, 489 N.Y.S.2d 246, 248 (2nd Dep't 1985);and <u>Yelin v. American Dental Center</u>, 184 A.D.2d 693, 694, 585 N.Y.S.2d 95, 96 (2nd Dep't 1992). It is quite apparent in this case that the moving papers, do not meet these requirements. The complete body of evidence reveals that, at a minimum, there are fact issues to be resolved by the triers of fact. For example, there is sworn deposition testimony from non-party witness Denise Lott that Defendant Sue Cole referred to Plaintiff as a "fucking nigger," at or near the time Plaintiff was initially going to be terminated. Yet Ms. Cole testified that she never uttered the racist and offensive words. Ms. Lott also testified that she reported the racial slur to Missy George of Bank of America's advice and counsel department. However, Ms. George testified that she never received any such complaint.

Furthermore, "[i]t is axiomatic that issue finding, rather than issue determination, is the crux of reviewing the denial of a motion for summary judgment..."; <u>Yelin v. American Dental Center</u>, <u>supra</u>; <u>see also</u>, <u>Ascher v. F. Garafolo Electric Co., Inc.</u>, 113 A.D.2d 728, 493 N.Y.S.2d 196 (2nd Dep't 1985), <u>aff'd.</u> 67 N.Y.2d 637, 499 N.Y.S.2d 681 (1986). "In reviewing a summary judgment motion, we must accept as true the evidence presented by the non-moving party, and the motion must be denied if there is even arguably any doubt as to the existence of a triable issue..." <u>Baker v. Briarcliff School District</u>, 205 A.D.2d 652, 613 N.Y.S.2d 660 (2nd Dep't 1994); <u>see also</u>, <u>Museums at Stony Brook v. Village of Patchogue Fire Department</u>, 146 A.D.2d 572, 536 N.Y.S.2d 177 (2nd Dep't 1989). The party opposing the motion for summary judgment is "entitled to have all reasonable inferences drawn in its favor." *Gulf Ins. Co. v. Transatlantic*

*Reinsurance Co.*, 886 N.Y.S.2d 133, 144 (1st Dept. 2009). Here there are numerous genuine issues of material fact, the resolution of which will clearly affect the outcome of the case.

## II. THERE IS AMPLE EVIDENCE TO SUPPORT PLAINTIFF'S CLAIMS OF RACE DISCRIMINATION UNDER BOTH THE NEW YORK STATE HUMAN RIGHTS LAW AND THE NEW YORK CITY HUMAN RIGHTS LAW

Defendants completely misstate the applicable legal standard for cases brought under the New York City Human Rights Law ("CHRL"). They incorrectly claim that cases brought under CHRL require the same presentation of proof that is applied to Title VII cases. (See Def. Memo at 5). In fact, the standard of proof in cases brought under NYCHRL is much more liberal.

### A. The New York City Human Rights Law

While Plaintiff has established his claims of race discrimination under both the New York State and New York City Human Rights Laws, it should be noted that the CHRL is much more protective of plaintiffs than its state and federal counterparts, and therefore has a more progressive standard. <u>Farrugia v. North Shire Univ. Hosp.</u>, 820 N.Y.S.2d 310 (Sup.Ct., N.Y.Co.2006).

The New York City Civil Rights Restoration Act of 2005[1] mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by the CHRL. <u>Williams v. New York City Housing Auth.</u>, 872 N.Y.S.2d 27 (1st Dept. 2009). It requires a more stringent analysis than that called for under either Title VII or the New York State Human Rights Law ("NYSHRL"). <u>Id</u>. In light of this explicit legislative policy choice by the City Council, Courts must separately analyze plaintiffs' HRL claims. <u>Id.</u> at 66.

---

[1] 2005 N.Y. City Legis. Ann., at 528-535.

While the Restoration Act amended the CHRL in a variety of respects, the core of the measure was its revision of Administrative Code § 8-130, the construction provision of the CHRL (Local Law 85, § 7):

> The provisions of this [chapter] title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

As a result of this revision, the CHRL now explicitly requires an independent liberal construction analysis in all circumstances, even where State and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the CHRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart State or federal civil rights laws. Id.

Section 1 of the Restoration Act amplifies this message. It states that the measure was needed because the provisions of the CHRL had been "construed too narrowly to ensure protection of the civil rights of all persons covered by the law." It goes on to mandate that provisions of the CHRL be interpreted "independently from similar or identical provisions of New York state or federal statutes." Taking sections 1 and 7 of the Restoration Act together, it is clear that interpretations of State or federal provisions worded similarly to CHRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed "as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise" (§ 1), and only to the extent that those State- or federal-law decisions may provide guidance as to the "uniquely broad and remedial" provisions of the local law.

The Committee Report accompanying the legislation likewise states that the intent of the Restoration Act was to "ensure construction of the City's human rights law in line with the

7

purposes of the fundamental amendments to the law enacted in 1991," and to reverse the pattern of judicial decisions that had improvidently "narrowed the scope of the law's protections" (Report of Committee on General Welfare, 2005 N.Y. City Legis. Ann., at 536). The City Council's debate on the legislation made plain the Restoration Act's intent and consequences:

> Insisting that our local law be interpreted broadly and independently will safeguard New Yorkers at a time when federal and state civil rights protections are in jeopardy. There are many illustrations of cases, like *Levin* on marital status, *Priore* [,] McGrath and *Forrest* that have either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore [sic] the text of specific provisions of the law, or both. With [the Restoration Act], these cases and others like them will no longer hinder the vindication of our civil rights.[2]

"In other words, the Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its State and federal counterparts, (b) *all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes and (c) cases that had failed to respect these differences were being legislatively overruled." Id. at 32.  Both New York State and federal courts have recognized a more liberal construction of the CHRL that is more protective than the State HRL or Title VII.  see, e.g., Pilgrim v. McGraw-Hill Cos., 599 F. Supp. 2d 462 (S.D.N.Y. 2009), Gallo v. Alitalia, 585 F. Supp. 2d 520 (S.D.N.Y. 2008), Selmanovic v. NYSE Group, Inc., 06 Civ. 3046, 2007 WL 4563431 at *5 (S.D.N.Y. Dec. 21, 2007), Pugliese v. Long Is. R.R. Co., 01 Civ. 7174, 2006 WL 2689600 (E.D.N.Y. Sept. 19, 2006), Tu v. Loan Pricing Corp., 2008 WL 4367589 (N.Y. Co.

---

[2] Statement of Annabel Palma at the meeting of the N.Y. City Council (Sept. 15, 2005, transcript at 41). Council Member Palma was a member of the Committee on General Welfare that had brought the bill to the floor of the Council. Committee Chairman Bill de Blasio emphasized that "localities have to stand up for their own visions" of "how we protect the rights of the individual," regardless of federal and State restrictiveness (transcript at 47). Council Member Gale Brewer, the chief sponsor of the Restoration Act, reiterated the comments of Palma and de Blasio, and the importance of making sure that civil rights protections "are stronger here than [under] the State or federal law" (transcript at 48-49). (Transcript on file with N.Y. City Clerk's Office and the N.Y. Legislative Service.

Sept. 23, 2008), <u>D'Avilar v. Cerebral Palsy Assocs.</u>, 2007 WL 3072452 (Kings Co. Oct. 23, 2007), <u>Sorrenti v. New York</u>, 2007 WL 2772308 (N.Y. Co. Aug. 16, 2007), <u>Farrugia</u>, <u>supra</u>.

The City Council directs courts to the key principles that should guide the analysis of claims brought under the CHRL: "discrimination should not play a role in decisions made by employers, landlords and providers of public accommodations; traditional methods and principles of law enforcement ought to be applied in the civil rights context; and victims of discrimination suffer serious injuries, for which they ought to receive full compensation." <u>Id.</u> at 68.

The Restoration Act requires that courts "be sensitive to the distinctive language, purposes, and method of analysis required by the City HRL, requiring an analysis more stringent than that called for under either Title VII or the State HRL." <u>Williams</u>, 872 N.Y.S.2d at 30-31. Section 1 of the Restoration Act mandates that the provisions of the CHRL must be interpreted "independently from similar or identical provisions of New York state or federal statutes." Local Law 85, §1. Accordingly, "interpretations of State or federal provisions worded similarly to City HRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise' (§1), and only to the extent that those State- or federal-law decisions may provide guidance as to the 'uniquely broad and remedial' provisions of the local law." <u>Williams,</u> 872 N.Y.S.2d at 31.

The Williams court adopted a standard that simply asks whether plaintiff was treated "less well" than other employees based on his membership in a protected class. <u>Williams,</u> 872 N.Y.S.2d at 39. Clearly under the facts presented in this case, Mr. Cook was treated "less well" than other Bank of America employees due to his race.

**B.      The New York State Human Rights Law**

The applicable provision of the New York State Human Rights Law (Executive Law §
296[1][a] ) states, in relevant part:

> It shall be an unlawful discriminatory practice:
> For an employer ..., because of the ... race ... [or] ... color ... of any individual, ...
> to discharge from employment such individual or to discriminate against such
> individual in compensation or in terms, conditions or privileges of employment.

In order to establish a *prima facie* case of race discrimination under the more stringent
New York State Human Rights Law, ("SHRL"), a plaintiff has the initial burden of establishing
racial discrimination by a preponderance of the evidence. Tu v. Loan Pricing Corp., supra. In
order to meet this burden, the plaintiff must show (1) that he is a member of the protected class,
(2) he was qualified to hold the position, (3) that he was terminated or suffered other adverse
employment action, and (4) the discharge or other adverse action occurred under circumstances
giving rise to an inference of discrimination. Id.   If the plaintiff meets this burden, the burden
shifts to the defendant to produce evidence that the adverse actions were taken for legitimate,
non-discriminatory reasons. Id.   If the defendant does so, the burden shifts back to the plaintiff to
show that the proffered reason was a mere pretext and that discrimination was the real reason. Id.

**1.      Plaintiff Has Established That He Suffered Numerous Adverse
Employment  Actions That Give Rise To An Inference of Discrimination**

Defendants do not contest that Plaintiff has fulfilled the first two requirements under the
standard - - - member of a protected class and qualified to hold the position, and instead claim
that any treatment that Plaintiff was subjected to was not an adverse employment action. (Defs.'
Mem. at 7).   Contrary to Defendants' argument, Plaintiff has suffered adverse employment
action under circumstances giving rise to an inference of discrimination.  Defendants attempt to
limit Plaintiff's discrimination claims to a small number of incidents, but the record is replete

with numerous adverse employment actions that support Plaintiff's discrimination and retaliation claims.

For example, Defendants attempt to belittle Plaintiff's complaints as if they were a minor inconvenience. (Def's Mem. at 8). However, the denial of the opportunity to conduct the SONYMA training for his team; the denial of the promotion he sought to senior vice president; the blatant interference with his ability to build his team (and replace poached loan officers); and subjecting him to unwarranted scrutiny related to the management of his team, all signaled to his internal and external colleagues that he lacked competence, credibility, and authority. In addition to the employment actions cited by Defendants, Plaintiff has provided a litany of further actions that he was subjected to in Plaintiff's Opposition to Statement of Material Facts By Movant. Taken separately or together, all of the adverse actions that Plaintiff endured were neither minor nor inconsequential.   They materially changed his working conditions by decimating his compensation, ending his high paying job with Bank of America, and destroying his credibility and reputation throughout the industry.

The nature, volume, and circumstances of the adverse actions clearly illustrate the discriminatory intent of Defendants.  Clear evidence of Defendants' race-based motive in their treatment of Plaintiff is that the majority of the adverse employment actions were initiated by someone who referred to him as a "fucking nigger," his manager Defendant Cole. The Court does not have to simply believe the employee or disbelieve the employer, as there is sworn deposition testimony of numerous witnesses relating to the discriminatory and retaliatory actions the Defendants took against Plaintiff. The comment "fucking nigger", which was made in September of 2008 by Sue Cole to Denise Lott, was near the time that Mr. Cook was initially going to be terminated. (See Plaintiff's 56.1 Statement of Material Facts in Opposition.)

### 2. Defendants' Cannot Establish a Nondiscriminatory Reason for Their Conduct.

Defendants claim that all actions taken against Plaintiff were due to his alleged performance deficits. However, it was only after Plaintiff complained about disparate treatment in January 2008, that Defendants began to trump up performance issues, always in areas that he was praised for before his complaints. For example, Defendants issued a written warning to Mr. Cook for allegedly failing to properly manage the declining performance of his team, specifically with regard to Eileen Vega's termination. And despite the fact that Advice and Counsel's own rules and previous instructions from Frazza himself to Cook supported Cook's position, the warning was issued anyway. Similarly, Mr. Cook had been praised in his 2007 year-end performance evaluation for matters of employee discipline, which was issued after Ms. Vega's termination. Defendants became relentless in their efforts to create a pretext for the clearly discriminatory treatment that they were subjecting him to.

Defendants attempt to rely on the disciplinary action that Frazza and Cole took against Plaintiff as evidence of his alleged poor performance, but their own written performance evaluations contradict the basis for any disciplinary actions. Counsel for Defendants delayed for months providing the performance evaluations requested in Plaintiff's First Request for Production of Documents, perhaps because they are full of praise and superlatives describing Plaintiff's work performance.

The contradictory nature of the written annual performance evaluations establishes that Defendants' disciplinary actions against Plaintiff, including the verbal and written warnings, were simply a pretext for unlawful race discrimination. It is simply not credible that out of the many people that Mr. Cook terminated before he lodged complaints of disparate treatment,

suddenly one termination would lead to a written warning regarding how he managed any declining performance of his loan officers.

Likewise, Plaintiff has provided ample evidence that his termination was discriminatory and retaliatory, and that the Bank's stated reason for terminating him was false and pretextual. After systematically targeting Plaintiff due to his race, Defendants made it clear that they wanted to get rid of him. By taking away his territory and giving it to his white peers, by poaching or terminating Plaintiff's top earners in order to negatively impact his earnings. The racist treatment that Plaintiff was subjected to increased exponentially after Plaintiff complained about discriminatory treatment. The bogus investigation started by the "anonymous" letter; and the accusation that Plaintiff violated the Bank communication policy were clearly pretextual reasons for terminating him.  Several white managers who had multiple non-public information ("NPI") violations were not disciplined or terminated for their actions, including Sue Cole. (Exhibit 1, P. 82, L. 19 through P. 84, L. 5.)

### 3.   Plaintiff has Also Met the Mixed-Motive Test to Establish Race Discrimination

Based on the evidence to date, the Plaintiff has raised triable issues of fact that Defendants subjected Plaintiff to disparate treatment for a variety of reasons. In addition, Plaintiff has established that race was a motivation in the adverse employment actions. Where a plaintiff shows that "an impermissible criterion in fact entered into the employment decision, a somewhat different analysis takes place." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.1992). In these so-called mixed-motive cases, courts use the analysis set forth in *Price Waterhouse v. Hopkins*. 490 U.S. 228,258 (1989) superseded by statute on other grounds, Civil Rights Act of 1991. At the first stage of the mixed-motive analysis, a plaintiff must show that "a prohibited discriminatory factor played a 'motivating part' in a challenged employment

decision...." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173 (2d Cir.2006) (citing *Raskin*, 125 F.3d at 60 citing *Price Waterhouse*, 490 U.S. at 258). " 'Evidence potentially warranting a *Price Waterhouse* burden shift includes, inter alia, policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Id.* at 173-74 (quoting *Raskin*, 125 F.3d at 60) (internal quotation marks and citation omitted) (emphasis in *Raskin*). In other words, "[t]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Id.* at 174 (quoting *Raskin*, 125 F.3d at 61).

At the second stage of the *Price Waterhouse* analysis, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway," *Raskin*, 125 F.3d at 60:

> "An employer may not, in other words, prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." Nor may the employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason."

*Bookman v. Merrill Lynch*, 02 Civ. 1108(RJS), 2009 WL 1360673, at *11 (S.D.N.Y. May 14, 2009) (quoting *Scully v. Summers*, 95 Civ. 9091(PKL), 2000 WL 1234588, at * 15 (S.D.N.Y. Aug. 30, 2000) quoting *Price Waterhouse*, 439 U.S. at 252).

"However, regardless of whether the *Price Waterhouse* or *McDonnell Douglas* framework is applied, the ultimate issue is: 'Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against [him] illegally.'" *Id.* (quoting *Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 233 (S.D.N.Y.1998)).

In the instant case, Cook has produced sufficient evidence to warrant the conclusion that Defendants discriminated against him illegally based on his race.  Cook was an extremely

successful branch manager who was referred to as a "fucking nigger" by his direct supervisor and named defendant in this case. Ms. Cole also complained that Cook was making more money then her, she was verbally warned for threatening to terminate Cook or anyone who refused to leave his team upon her request and his more senior supervisor was verbally warned about threatening to terminate him as well. All of these facts support the discriminatory act of dividing Mr. Cook's territory, removing his top earners and decreasing his compensation. Similarly, Sue Cole referred to Mr. Cook as a "fucking nigger" at the time he was about to be fired.

### III.   PLAINTIFF CLEARLY ESTABLISHES A PRIMA FACIE CASE OF RETALIATION

In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that he: 1) engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered an adverse action; 4) there was a causal connection between the protected activity and the adverse employment action. Pilgrim v. McGraw Hill, supra.

The Court should note that while the retaliation that Plaintiff was subjected to meets the "an adverse employment action" standard, under CHRL this is no longer the applicable standard as the CHRL proscribes all retaliation, and has no requirement that the adverse employment action be materially adverse. In 2005, the City Council decided to "'make clear that the standard to be applied to retaliation claims under the City's human rights law differs from the standard currently applied by the Second Circuit in [Title VII] retaliation claims . . . [and] is in line with the standard set out in the guidelines of the Equal Employment Opportunity Commission.'" Williams, 872 N.Y.S.2d at 33 (citing Committee Report, 2005 Legis. Ann. at 536). The CHRL currently proscribes retaliation "in any manner." N.Y. Admin. Code §8-107(7). As worded, section 8-107(7) "specifically rejects a materiality requirement." Id. at 34 n. 12. "[T]he language of the City HRL does not permit any type of challenged conduct to be categorically rejected as

nonactionable. On the contrary, no challenged conduct may be deemed nonretaliatory before a determination that a jury could not reasonably conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity.'" Id. at 34. Accordingly, plaintiff's allegations are sufficient to allege retaliation.

Clearly Plaintiff has demonstrated retaliation since his complaints were understood to be about race. Immediately after his complaints to Matt Vernon and James Jackson, Advice and Counsel and Human Resources began circling the wagons and taking steps to protect the bank from a race discrimination lawsuit. Defendants attempted to turn the tables and began to investigate Mr. Cook by opening a file on him, initiating bogus investigations of him and his loans by corporate security. Even Defendant Frazza acknowledged that Mr. Cook's complaints were about race discrimination. (Exhibit 3, Frazza Dep. P. 227, L. 22 through P. 228, L. 5.) This knowledge, however, did not stop Defendants from continuing to discriminate and retaliate against Mr. Cook.

After his complaints of race discrimination, Defendants retaliated against Plaintiff from every angle. His immediate managers, Frazza and Cole, as well as personnel in Advice and Counsel and Human Resources all conspired to adversely impact the terms and conditions of his employment. His management of his team was scrutinized more than his similarly-situated white peers, including being held to a completely different and arbitrary standard. Loan officers who remained loyal to him, were targeted as well, including Denise Lott, Providence Aiossa, and Carlos Jaramillo, who were all subjected to bogus investigations that with Ms. Aiossa and Mr. Jaramillo resulted in their wrongful terminations. Retaliation was the norm at Bank of America. Missy George testified that one African-American sales manager, Cheryl Davis laughed out loud

when it was suggested that she wouldn't be retaliated against. (Exhibit 10, George Dep. P. 113, L. 21 through P. 114, L. 3).

It is clear that the reason Defendants did not terminate Plaintiff in September 2008, after the initial wrongful termination decision was made, was because they wanted an opportunity to further sully and damage his name and reputation and create more pretextual reasons for his unlawful firing.  Over the next seven months, Mr. Cook was subjected to disparate treatment related to his Family Medical Leave Act, with Defendants Cole and Frazza erecting retaliatory obstacles to his return to work. (Exhibit A to Memorandum of Law.)  He was subjected to further retaliation with the initiation of a corporate security investigation, prompted by an "anonymous" letter believed to have been written by Sue Cole. And finally, even after the corporate security investigation revealed no wrongdoing on his part, he was terminated in March 2009. (Exhibit 2, P. 410, L. 21-25.)  It is clear the Defendants were concerned that their September 2008 termination decision was not valid, so they spent the next several months concocting additional pretextual reasons to terminate Plaintiff.

IV.    **A MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED WHEN DISCOVERY HAS NOT BEEN COMPLETED**

Defendants have produced more than 7000 pages of documents since filing their motion for summary judgment.  The majority of the documents produced were requested in Plaintiff's First Request for Production of Documents served on January 25, 2010.  The delay in producing relevant documents illustrates bad faith on the part of Defendants.  In addition, Bank of America, has failed to produce completely redacted documents in spite of the fact that there is a signed protective order in this case. They have likewise failed to produce countless requested documents, including the personnel files of Mr. Cook's comparators, documents relating to decisions made by legal in conjunction with Advice and Counsel and Frazza regarding Mr.

Cook's termination, and other critical records.  Based upon this failure, summary judgment should be denied. (See, In the Matter of Fasciglione, 899 N.Y.S.2d 645 (2nd Dep't 2010)).

### V.   COLE AND FRAZZA WERE PROPERLY SERVED AND THEIR ACTIONS ARE INEXTRICABLY ENTWINED WITH BANK OF AMERICA'S LIABILITY

To begin with, both Sue Cole and John Frazza were properly served in this action. (See Plaintiff's 56.1 Statement in Opposition, paragraph 150 and accompanying Exhibits 29 and 30.) The affidavits of service clearly identify that the complaints against Cole and Frazza were served upon an employee of Bank of America at the actual place of business for Frazza and Cole. This employee identified himself as a co-worker of the two.

Secondly, the suggestion that claims against Frazza and Cole for aiding and abetting must fail is meritless, where as here, Frazza and Cole were the principle actors giving rise to the discrimination and acted in concert with Advice and Counsel to "minimize" the Bank's risk of losing a lawsuit to Mr. Cook on those grounds.

### CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated: New York, New York
       June 11, 2010

                              Respectfully submitted,

                              THE COCHRAN FIRM

                              _____
                              Derek S. Sells (DS-8891)
                              Tracey L. Brown (TLB4094)
                              Attorneys for Plaintiff
                              233 Broadway, 5th Floor
                              New York, New York 10279
                              (212) 553-9165

TO:    EDWARDS ANGELL PALMER & DODGE LLP
         Attorneys for Defendants *Pro hac vice*
         111 Huntington Avenue
         Boston, Massachusetts 02199
         (617) 517-5596

         KAUFMAN BORGEEST & RYAN LLP
         Attorneys for Defendants
         120 Broadway, 14th Floor
         New York, New York 10271
         (212) 980-9600

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK    )
: ss.:
COUNTY OF NEW YORK  )

    BARBARA TATEO, being duly sworn, deposes and says:

    I am not a party to the action, am over 18 years of age and reside in Morris County, New Jersey.

    That on the 11th day of June, 2010, I served the within

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

on the following attorneys at the address(es) designated by said attorneys for the purpose by depositing a true copy of same, enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within New York State:

> KAUFMAN BORGEEST & RYAN LLP
> Attorneys for Defendants
> 120 Broadway, 14th Floor
> New York, New York 10271
> (212) 980-9600
>
> EDWARDS ANGELL PALMER & DODGE LLP
> Attorneys for Defendants *Pro hac vice*
> 111 Huntington Avenue
> Boston, Massachusetts 02199
> (617) 517-5596

BARBARA TATEO

Sworn to before me this
11th day of June, 2010

Notary Public

PATRICIA LYNCH
Notary Public, State of New York
No. 01LY6145452
Qualified in New York County
Commission Expires May 8, 2014

20