UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
KEITH COOK,                                                     Civil Action No. 09-cv-8039

                              Plaintiff,

                                                               **LOCAL RULE 56.1**
          -against-                                            **PLAINTIFF'S OPPOSITION TO**
                                                               **STATEMENT OF MATERIAL**
BANK OF AMERICA & CO., JOHN FRAZZA,                            **FACTS BY MOVANT**
SUSAN COLE,

                              Defendants.
-------------------------------------------------------------X

Pursuant to local Rule 56.1(b), plaintiff, KEITH COOK, submits this Statement of

Material Facts in opposition to Defendants' motion for summary judgment.

### STATEMENT OF MATERIAL FACTS IN
### OPPOSITION TO MOVANT'S 56.1 STATEMENT

1. – 6.   <u>Admit</u>.

7.        <u>False</u>. Plaintiff realized he was being discriminated against in his job since 2006

when Sue Cole became his manager. (<u>See</u> Cook deposition at P. 162, L. 16-23, and P. 163, L. 4-

20). He complained about adverse employment actions that occurred prior to January 2008 that

he believed were based on discrimination, including the SONYMA training, failure to be

promoted to Sr. Vice President, phone bill reimbursement, and other pre-January 2008 actions, in

letters and emails by using words that suggested he was being treated differently than his white

counterparts. (Cook deposition at P. 357, L. 4 through P. 363, L. 21).

8. – 9.   <u>False</u>.   Keith Cook first experienced race discrimination when Sue Cole became

his manager in 2006. (<u>See</u> Cook deposition at P. 162, L. 16-23, P. 163, L. 4-20, P. 357, L. 4

through P. 363, L. 21.)  Mr. Cook viewed Cole's affect, demeanor, comments that she made to

others and her treatment of him to be discriminatory. His belief was justified as Denise Lott, a

white, female Bank of America employee, testified that behind Mr. Cook's back, defendant Sue Cole referred to him as a **"FUCKING NIGGER"**. (**Exhibit 1** - Lott deposition at P. 54, L. 5 through P. 55, L. 7.)  Mr. Cook testified further that he was subjected to disparate treatment in that his white peers (Area Sales Managers), Mike DiDonna, Darcy Gore, Derrick Sawyer, Mike DeBronzo, Phil, Amber Lawless, and others, were allowed to coach their team to success while Sue Cole blocked his attempts to do the same. (See Cook deposition at P. 165, L. 7-17, and P. 167, L. 8 through P. 169, L. 1.)

Furthermore, although Keith Cook stated his belief that Sue Cole and John Frazza were the individuals who discriminated against him, he also believed that Bank of America conspired with Cole and Frazza to cover-up the discrimination by firing him under a false pretext and by fostering a hostile work environment. (See Cook deposition P. 164, L. 16 through P. 165, L. 6, and P. 177 L. 12 through P. 178, L. 17.)

For example, a division of Bank of America, Advice and Counsel, authored the cover-up as part of its function. Diane Rhine of Advice and Counsel described her function and that of Advice and Counsel in handling Keith Cook's case as one of minimizing the risk to the Bank of losing a lawsuit based on retaliation and discrimination. (**Exhibit 2** – Rhine deposition, P. 231, L. 11 through P. 233, L. 17.)  In this regard, any evidence of race discrimination against Keith Cook was either ignored, not investigated or lied about.

Missy George, who was another member of Bank of America's Advice and Counsel team, was told in a complaint by Denise Lott that Sue Cole called Keith Cook a "fucking nigger." (Exhibit 1 at P. 55, L. 4 through P. 56, L. 24.)  Missy George did not report this complaint to other members of Advice and Counsel who were reviewing Keith Cook's situation within the bank like Diane Rhine; she did not investigate the allegations made by

Denise Lott though it was supposed to be done; and Ms. George (for purposes of this motion where all facts are to be viewed in the light most favorable to the non-movant) lied at her deposition and her affidavit to the summary judgment motion about whether she even fielded such a call. (See Exhibit 2 at P. 324, L. 19 through P. 326, L. 21; and **Exhibit 10** – George deposition, P. 98, L. 6 through P. 99, L. 7.)

Another example of how Advice and Counsel minimized risk to the Bank was seen in how it dealt with the issue of disparate treatment regarding the enforcement of progressive discipline. Specifically, Diane Rhine testified that Sue Cole failed to do her job in supervising Keith Cook regarding this policy. (Exhibit 2, P. 258, L. 14; P. 260, L. 7.)  Instead of referring Sue Cole to Advice and Counsel for disciplinary action as he did with Keith Cook, John Frazza simply coached Sue Cole and got Keith Cook fired. (**Exhibit 3** – Frazza deposition, P. 318, L. 8 through P. 319, L. 14.)  Moreover, despite the fact that Diane Rhine believed that this type of disparate treatment is discriminatory if based on race, she nor Advice and Counsel investigated the matter. (Exhibit 2, P. 257, L. 8-24.)

Similarly, Advice and Counsel was made aware that Keith Cook complained about disparate treatment of other white branch managers in his region who failed to follow the progressive discipline policy and who were not fired or subjected to the same punishment that he faced. (Exhibit 2, P. 250, L. 13 through P. 253, L. 11.)  Despite the fact that Advice and Counsel was aware that the only way to determine if Mr. Cook was discriminated against would be to view how white branch managers carried out the policy, no such investigation was done.[1] Id. Had Advice and Counsel checked, they would have found that numerous white branch managers

---

[1] Throughout this litigation plaintiffs have requested the personnel files of each branch manager under Sue Cole's and John Frazza's supervision as well as records pertaining to their enforcement of the progressive discipline policy. To date, no such records have been produced. (See **Exhibits 4** and **5** – letter to Siobhan Sweeney dated 4/12/10 and Response to Document Requests dated 6/8/10.)

under Cole's and/or Frazza's supervision violated the same policy with impunity. Part of the policy as it existed in 2006-2007 required branch managers to fire Mortgage Loan Officers ("MLO" or "MLOs") who operated at a deficit for five months consecutively or for six months out of a twelve month cycle (**Exhibit 15**, Frazza deposition of 6/10/10 at P. 19), absent extenuating circumstances.

According to Bank of America's Deficit Update for John Frazza's region as of 10/31/07, there were white branch managers in Maine; Bristol, RI; Boston, MA; Denville, NJ; Rochester, NY; White Plains, NY; Cape Cod; and New Hampshire who had at least one MLO who was out of deficit for more than six months consecutively that were not terminated. (**Exhibit 16**, P. 7 – Bates #012934.) None of these white branch managers, including Donna Talarico (Maine), Mary Ruth Ryan (Rhode Island), Darcy Gore (Denville, NJ), Mike Didonna (Rochester/White Plains), Tom Preston (Cape Cod), nor Derek Sawyer (New Hampshire) were disciplined. (Exhibit 15, P. 20, L. 7 through P. 31, L. 13.) The only one who did receive discipline was Keith Cook.

10. – 12.    Admit.

13.    <u>Untrue</u>.    Plaintiff believed that Sue Cole discriminated against him from the beginning of her tenure at Bank of America in 2006 as described above. The Answer recited in this paragraph was only in reference to why he believed <u>John Frazza</u> discriminated against him in the SONYMA training.  Defendant Bank of America's stated fact is therefore contested. (<u>See</u> Cook transcript at P. 176, L. 21-24.)

14.    <u>Incorrect</u>.    Sue Cole and John Frazza developed a plan, in a racially discriminatory way with harmful consequences, to remove territory from Keith Cook in late 2007 and then shared the plan with others. (Exhibit 3, P. 86, L. 16 through P. 89, L. 17.)  Sue

Cole and John Frazza knew that taking away the Long Island and Manhattan territory would have an adverse impact on Keith Cook's employment by reducing his income. (Id. at P. 90-91.)

     15.    <u>Admit</u>.

     16. – 17.    <u>False</u>.  Plaintiff believed this severance of his territory was an act of racial discrimination. (<u>See</u> Cook deposition at P. 182, L. 19 through P. 183, L. 12.)  Mr. Cook was clearly not happy about the severance of his territory. (Exhibit 3, P. 91, L. 16 through P. 92, L. 5.)  As part of the severance, Sue Cole brought in new branch managers and tried to force Mr. Cook's top producers and the biggest earners to leave his team and join the new managers. (Exhibit 1, P. 37, L. 16 through P. 38, L. 19.)  These top producers on Mr. Cook's team were told they didn't have a choice and would get fired if they didn't follow her orders. (Id. at P. 39, L. 12 through P. 41, L. 12.)  Sue Cole did this because each of the top earners objected to the transfer. (Exhibit 6, P. 67, L. 10-19.)  The language used was a violation of Bank of America ethics and resulted in Sue Cole being reprimanded with a written warning and accused of creating a hostile work environment. (Exhibit 6, P. 87, L. 4 through P. 88, L. 24.)  Keith Cook complained to Sue Cole as well for attempting to poach his team for the other white managers. (Exhibit 6, P. 66, L. 19-22.)

     18. – 20.    <u>False</u>.  While some MLOs wrote letters and Providence Aiossa was fired, other top producers from Mr. Cook's team that refused to transfer were retaliated against as well. Carlos Jaramillos and Kevin Cheung were fired. (**Exhibit 7** – O'Garrow deposition, P. 123, L. 18 through P. 124, L. 3.)  Denise Lott, who was another high volume producer of Keith Cook's team, was the subject of an anonymous complaint along with Keith Cook, Carlos Jaramillos and Kevin Cheung. (**Exhibit 8** – anonymous complaint letter.)   Based upon the information contained in the letter, Denise Lott is 99% sure it came from Sue Cole. (Exhibit 1, P. 72, L. 2

through P. 74, L. 4.)   Another top producing MLO from Mr. Cook's team, Carlos Morales, received a quid pro quo from Sue Cole to transfer after he initially refused. (Exhibit 1, P. 50, L. 10-24.)

21.     Admit.

22.     False.   In an act of disparate treatment, John Frazza learned that a potential mortgage loan officer who interviewed for a position on Keith Cook's team wrote a letter alleging a potential nefarious relationship between Sue Cole and Jackie Fariello. (Exhibit 3, P. 254, L. 11 through P. 262, L. 19.)   The letter indicated the possibility that Sue Cole may have been receiving a kickback or some improper benefit as a result of steering a qualified MLO away from Mr. Cook's team and toward Jackie Fariello. Id.   Defendant Frazza never investigated the allegations nor did he refer the matter for such an investigation because he needed to know more about the source. (Id. at P. 258, L. 6-13.)   In a clear act of disparate treatment, Keith Cook and the loyal team members who refused transfer were investigated based upon an anonymous complaint with no investigation done to find out the source.

23.     Unclear.   In a big question of fact, Sue Cole testified that John Frazza denied the request to promote Keith Cook to supervisor despite the fact that she disagreed with his decision and advocated for him (See Exhibit 6 at P. 128 L. 25 through P. 129, L. 17), while John Frazza testified that Sue Cole made the decision by not recommending Keith Cook for the promotion (See Exhibit 3, P. 73, L. 25 through P. 75, L. 3).

24.     False.   Mr. Cook sought the title of Senior VP because he fit the criteria for the promotion and needed it to help him drive his business development. (See **Exhibit 9** – email dated 9/12/07.)

25.    <u>False</u>.   While it is true that Mr. Cook's salary would not have changed, more business would have helped Mr. Cook generate bigger commissions for his commission based pay. The title would have been significant in allowing Mr. Cook to get more business.

26.    <u>False</u>.   While Mr. Cook certainly met the criteria for Senior VP, he also believed that Sue Cole was a racist based upon her comments, demeanor towards him, and other things mentioned previously. Mr. Cook certainly believes that racism played a part in every adverse decision she made against him. (<u>See</u> Cook deposition at P. 162, L. 16-23 and P. 163, L. 4-20.)

27.    <u>False</u>.   Plaintiff is now aware that despite managing a number of black Vice-Presidents, John Frazza has never promoted one to Senior VP status. (<u>See</u> Exhibit 3 at P. 66, L. 5-8.)  On the other hand, plaintiff is now aware that Frazza has promoted Sue Cole, Donna Telarico, Mary Ruth Ryan, Kevin Moran and Darcie Gore for Senior VP, all of whom are white. (Exhibit 3 at P. 248, L. 9 through P. 252, L. 25.)

28.    <u>False</u>.   Plaintiff is now aware that Cheryl Davis, who is a black VP under Sue Cole's supervision, was denied promotion by John Frazza despite the fact that Sue Cole claimed to have supported her promotion. (<u>See</u> Exhibit 6 at P. 201, L. 22 through P. 202, L. 13; and Exhibit 3 at P. 249, L. 13-21.)

29. – 31.    <u>Admit</u>.

32.    <u>Admit</u>.   Plaintiff believes that this too was an act of discrimination because of disparate treatment. (<u>See</u> Cook transcript at P. 201, L. 11-21.)

33.    <u>False</u>.  See Answer to paragraph 7.

34. – 38.    <u>Admit</u>.   Except note that Mr. Cook requested personnel folders of all managers which would include disciplinary actions. The Bank has refused to disclose this information. (<u>See</u>  Exhibit 5.)

39. – 46.        Admit with the incorporated disputed facts contained in plaintiff's responses to paragraphs 14, 15, 16, 17, 18, 19 and 20 to complete the factual scenario surrounding the break-up of Mr. Cook's territory.

47.        Generally <u>Admit</u> because Plaintiff believes it could have been 2% or 5% of his team's Manhattan concentration. (<u>See</u> Cook transcript at P. 233, L. 19 through P. 234, L. 5.)

48. – 49.        <u>Admit</u> with incorporated disputed facts contained in plaintiff's responses to paragraphs 14, 15, 16, 17, 18, 19 and 20 to complete the factual scenario surrounding the break-up of Mr. Cook's territory.

50.        <u>False</u>.  While plaintiff did believe it was retaliation, he believed it was based on his complaints of racial discrimination and disparate treatment. (<u>See</u> Cook transcript at P. 205, L. 11 through P. 206, L. 4.)

51. – 53.        <u>Admit</u>.

54. – 55.        <u>False</u>.  The comments by Frazza in paragraph 51 were directed to Mr. Cook because Frazza looked directly at Mr. Cook while making them despite the fact that there were 15 people in the room at that time. (<u>See</u> Cook transcript at P. 206, L. 8 through P. 208, L. 15.)  In addition, Frazza was found to have committed this act against Mr. Cook by Bank of America as he was verbally warned about it. (Exhibit 3 at P. 44, L. 10 through P. 45, L. 10.) These statements were part and parcel of the racially discriminatory plot to remove Keith Cook's top producers from his team. (<u>See</u>, <u>supra</u>, disputed fact relating to paragraph 14.)

56. – 58.        <u>Admit</u> that an email was sent. The characterization of the email is not correct. The email referred to in these paragraphs set forth the racially discriminatory actions that Mr. Cook suffered at the hands of Sue Cole and John Frazza with the regard to his team being broken up, his top producers being transferred, his position as Manhattan Sales Manager being

posted, a prized hire being undermined, his sales assistant being taken away and his office space being removed. (Exhibit 2, defendant's deposition Exhibit 1), (Cook deposition P. 182, L. 7-23, P. 211 L. 4 through P. 227, L. 21.) The prized recruit was James Dorceley who Mr. Cook had offered a position to and had a start date with Bank of America. (Exhibit 6, P. 56, L. 7-11.) Although Mr. Cook offered him a position on his team, Sue Cole told James Dorceley that he would not work for Keith Cook but instead would work for the new Manhattan Branch Manager, Jackie Fariello, after Mr. Cook already had made the offer to be on his team. (Cook deposition at P. 247, L. 17 through P. 245, L. 11.) Mr. Cook complained to Sue Cole and she said "tough". (Cook deposition P. 247 L. 10-20.) Mr. Cook sent the email to complain about the racially disparate treatment and retaliation he faced at Frazza's and Cole's hands and to ask for help and possibly a transfer. (Cook deposition P. 242, L. 15 through P. 243, L. 6; P. 226, L. 2 through P. 228, L. 7.)

59. – 62.    Admit.

63.    False. The allegations in the 1/31/08 email set forth race discrimination, disparate treatment based on race and retaliation. (See supra response to paragraphs 56-58.) In fact, John Frazza was questioned about Mr. Cook's claims of racial discrimination in February of 2008. (Exhibit 3, P. 228, L. 22 through P. 229, L. 5.)

64.    False. Mr. Cook clearly identified the time frame of the James Dorceley – Sue Cole interview as occurring prior to the January 31, 2008 email since he made reference to it in the email. (Cook deposition P. 242, L. 2 through P. 245, L. 11; P. 251, L. 20 through P. 252, L. 14.) Admit that Cole told Dorceley that he would work for someone other than Mr. Cook and that Mr. Cook would not be at the Bank.

65. – 66.   <u>Admit</u>.   That Sue Cole's actions with regard to James Dorceley were racially discriminatory and retalitatory.

67.   <u>Admit</u> with the added evidence that Keith Cook believed the transfer of his team as well as all other adverse employment decisions made by Sue Cole were racially discriminatory as set forth above.

68.   <u>False</u>.  See response to paragraph 64.

69. – 91.   Mr. Cook acknowledges being given a written warning in connection with the termination of Eileen Vega. However, this warning was merely a pretext developed by Advice and Counsel, Frazza and Cole to develop a race neutral reason for taking adverse action against Mr. Cook.  To begin with, the written warning makes reference to a requirement that Advice and Counsel be contacted "for every specific associate performance problem." (See written warning [Defendant's Deposition Exhibit 3].)  Such a policy did not exist and was made up by Advice and Counsel as a pretext. Annexed as **Exhibit 11** is Mr. Cook's rebuttal to the written warning which spelled out the fact that Advice and Counsel was not a required contact prior to taking adverse action against the underperforming associate. Moreover, annexed as **Exhibit 12** is an email from Frazza dated 10/2/06 to Keith Cook specifically stating that Advice and Counsel was not a required contact but would be utilized "as appropriate" in HR moves. Advice and Counsel indicated as well that with regard to its guidelines for managing declining performance that "application of this information to particular circumstances needs to be considered on a case-by-case basis." (See **Exhibit 13** at P. 2.)  Advice and Counsel rules also state that the **"MANAGERS ARE ENCOURAGED TO USE THESE GUIDELINES. HOWEVER, THESE ARE ONLY GUIDELINES. THEY ARE NOT INFLEXIBLE. MANAGERS ARE EXPECTED TO USE JUDGMENT AND DISCRETION IN**

**APPLYING THE GUIDELINES.**" (emphasis added). <u>Id</u>. at P. 4.  Advice and Counsel also "strongly advised" managers to contact Advice and Counsel when considering involuntary terminations but did not make it a requirement. <u>Id</u>. at 14.  Clearly if Advice and Counsel wished to absolutely require managers to contact it before termination, Advice and Counsel would have clearly stated the requirement as it did regarding demotions:

> "If considering demotion for an associate described in the points above, <u>always</u> first consult with Advice and Counsel." (emphasis added.) <u>Id</u>. at 12.

The written warning given to Mr. Cook regarding the Eileen Vega termination was thus based on a disparate application of the managing declining performance standard. It went against Frazza's own policy as stated in his 10/2/06 email, it went against Advice and Counsel's own published guidelines, and served as a pretext for adversely affecting Mr. Cook's employment history. Tellingly, in Mr. Cook's 2007 year-end evaluation (done on 1/14/08 following the Vega termination), one of Mr. Cook's strengths was applying management focus and discipline. (**Exhibit 14**, P. 8 – bates #3357). For that competency (instill management focus and discipline), Mr. Cook was given an "Exceeds Expectations." (<u>Id</u>. at P. 7 – Bates #3356.)  Mr. Cook testified about the disparate enforcement of this policy against him at P. 293 through P. 295 of his deposition. In addition, Mr. Cook did take the class referred to in the written warning. (Cook deposition at P. 296, L. 17 through P. 297, L. 3.)

92.   <u>False</u>.  See response to paragraphs 69-91.

93.   <u>Admit</u>.  Plaintiff was not required to contact Advice and Counsel on every associate performance problem. In fact, Diana Rhine of Advice and Counsel testified that "[a] verbal warning is not required to be called into Advice and Counsel. A verbal warning is not required to be documented in Advice and Counsel." (Exhibit 2, P. 285, L. 5-10.)

94.   Admit.

95. – 99.   Misleading.   In response to a complaint that Mr. Cook received from one of the Bank's customers regarding MLO Ricardo Mercado, Mr. Cook brought it to the attention of his managers on June 4, 2008. (**Exhibit 17.**) The next day, John Frazza, instead of putting in a complaint against Mercado with Advice and Counsel or responding to the Bank's customer, made a complaint to Advice and Counsel about Keith Cook. (Exhibit 2, P. 120, L. 5 through P. 121, L. 12.) The complaint that was made by Frazza to Advice and Counsel spurred an investigation into Mr. Cook. As part of the investigation Advice and Counsel prepared a script for Frazza, Julia Caslin and Marguerite Clifford to use in a conference call with Cook. (**Exhibit 18.**) Advice and Counsel understood that Mr. Cook felt like he was being targeted because of his race and prepared Frazza, Caslin and Clifford to answer his questions if he raised them. (**Exhibit 19.**) Despite the fact that Frazza was told that this was a confidential matter, he clandestinely violated confidentiality by trying to send the script to Sue Cole. (**Exhibit 20.**) By accident, the script was sent to Keith Cook in advance of the call and Keith Cook responded to each of the questions by email. (**Exhibit 21.**) Since the true purpose of the call was to try to intimidate and catch Mr. Cook unprepared, Julia Caslin asked Frazza, "Why the choice to share the notes?". (Exhibit 20.)   After explaining his mistake, Frazza revealed the retaliatory and discriminatory motive of the call by asking whether there was "[a]ny harm done" by sending the script to Keith Cook. (Exhibit 20.)   And despite the fact that the script advised Mr. Cook that he could be fired for violating confidentiality, nothing was done to Frazza. All of these facts which supplied the backdrop of the call supported Mr. Cook's belief that the Mercado investigatory call was discriminatory and retaliatory.

100.   Admit.

101.   <u>False</u>.  Mr. Cook's complaints in January had already sparked an investigation into racial discrimination and retaliation as John Frazza was questioned about that in February of 2008. (Exhibit 3, P. 228, L. 22 through P. 229, L. 5.)  Missy George simply chose not to treat Mr. Cook's complaint as one involving racial discrimination and retaliation just as she chose to ignore Denise Lott's complaint about Sue Cole referring to Mr. Cook as a "fucking nigger." (Exhibit 1, P. 54, L. 5 through P. 55, L. 7.)

102.   <u>Admit</u> that the words discrimination and retaliation do not appear in the email.

103. – 104.   <u>Admit</u>.

105. - 106.   <u>False</u>.   The email reflects Mr. Cook's belief that he was being discriminated against because of his previous complaint of racial discrimination. As previously mentioned, following Mr. Cook's January 31, 2008 email to his superiors, an investigation occurred wherein John Frazza was questioned about racial discrimination and retaliation in February 2008; a full four months before the June 6, 2008 email. (Exhibit 3, P. 228, L. 22 through P. 229, L. 5.)

107. – 108.   <u>False</u>.  See response to paragraph 101.

109.   <u>Admit</u>.

110.   <u>False</u>.   Completely misstates the record. The series of questions on Page 407 makes clear what Mr. Cook meant by "documentable pattern of retaliation".

111. – 112.   <u>Admit</u>.

113.   <u>False</u>.   Plaintiff is personally aware that Sue Cole received a written warning about her conduct. (**Exhibit 22**.)

114. – 116.   <u>False</u>.  See response to paragraph 101.

117. – 119.   <u>Admit</u>.

120. – 123.      While it is true Mr. Cook did not tell Frazza or Cole about his decision to change closing attorneys, there was no requirement or protocol for him to do so. **(Exhibit 23.)** Mr. Cook sent an email to Frazza setting forth a conversation he had with Bank of America employee Richard Bramhall. (Id. P. 5.)  Mr. Cook let Frazza know that Bramhall believed that Sue Cole was out to get Mr. Cook. (Id. P. 5.)  Mr. Cook believed that he was being discriminated against and sent a follow-up email to Diana Rhine identifying a developer who changed closing attorneys without first telling Cole or Frazza. **(Exhibit 24.)**

124.   Admit.

125.   False.  Mr. Cook sent a draft of the letter to Frazza before sending a copy to Jackson. (Cook dep. at P. 327, L. 15 through P. 328, L. 17.)

126.   False.  Frazza considered this as a pretext to fire Keith Cook.

127.   False.  Mr. Cook took the class (Cook dep. P. 296, L. 17 through P. 297, L. 3) and applied the Bank's policy of managing declining performance. In fact, Frazza relayed to Advice and Counsel after reviewing Mr. Cook's performance from the Pipeline Audits conducted in September 2008 that no problems showed up in Mr. Cook's territory. **(Exhibit 25.)**

128.   False.  By the summer and fall of 2008, Advice and Counsel had put a hold on all of Mr. Cook's performance management decisions. **(Exhibit 31.)**

129.   False.  Diana Rhine was doing her job of minimizing risk to the Bank of losing a race discrimination suit against Mr. Cook by trying to develop pretextual reasons for which to fire Mr. Cook. (Exhibit 2, P. 231, L. 11 through P. 233, L. 17.)  This so-called investigation showed no wrongdoing on Mr. Cook's part and each of the adverse employment actions were discriminatory. (See responses above.)

130.   <u>False</u>.  The decision to fire Mr. Cook ultimately came from Bank of America Legal.[2]  (Exhibit 3, P. 334 through P. 345.)  These attorneys gave their blessing to the firing before action was taken. (<u>Id</u>.)

131. – 133.   <u>False</u>.   For the reasons stated above, the statements made in these paragraphs are simply pretextual reasons given for the termination.

134. – 135.   <u>Admit</u>.

136.   <u>False</u>.  The letter was written by Sue Cole. (Exhibit 1, P. 72, L. 2 through P. 74, L. 4.)

137.   <u>False</u>.  There was an investigation done but the aim of the investigation was to get Keith Cook and not undercover the truth. (Exhibit 7, P. 46 through P. 52, L. 22.)

138.   <u>Admit</u>.

139. – 140.   <u>False</u>.  Mr. Cook was told he had to cooperate fully with the confidential investigation. (<u>See</u> Exhibit 26, P. 3, ¶3.)

141.   <u>Admit</u>.

142.   <u>False</u>.  Bank policy prohibits sending non-public customer information via email (Exhibit 15, P. 35-36) through unsecure means.

143.   <u>False</u>.  At the request of corporate security, Mr. Cook sent public information to security. (Cook dep. P. 435, L. 8 through P. 438, L. 12.)

144. – 148.   <u>False</u>.  Mr. Cook did not violate Bank of America policy by sending an email containing public information from his personal computer. (Exhibit 15, P. 35, L. 12 through P. 36, L. 12.)  Notwithstanding that there was no violation, Bank of America has had

---

[2]  Plaintiff requested all documents pertaining to Bank of America's privilege log relating to attorney-client privilege. Bank of America said it would reconsider but never did provide documents relating to Keith Cook from its attorneys.

numerous employees who repeatedly violated the policy and who did not get terminated. (See for

example **Exhibits 27 and 28** repeat violators.)

149.   Admit.

150.   Both Cole and Frazza were served in this case consistent with New York CPLR

§308(2). (See **Exhibits 29** and **30**.)  Since neither Cole nor Frazza have answered, plaintiff will

seek leave to move for default judgments against both.


Dated: New York, New York
       June 11, 2010


                                              Yours, etc.

                                              _____
                                              Derek Sells (DS8891)
                                              THE COCHRAN FIRM
                                              Attorneys for Plaintiff
                                              233 Broadway, 5th Floor
                                              New York, New York 10279
                                              (212) 553-9215


TO:    Siobhan M. Sweeney, Esq.
       EDWARDS ANGELL PALMER & DODGE LLP
       Attorneys for Defendants *Pro hac vice*
       111 Huntington Avenue
       Boston, Massachusetts 02199
       (617) 517-5596

       KAUFMAN BORGEEST & RYAN LLP
       Attorneys for Defendants
       120 Broadway, 14th Floor
       New York, New York 10271
       (212) 980-9600

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK          )
                           : ss.:
COUNTY OF NEW YORK    )

BARBARA TATEO, being duly sworn, deposes and says:

I am not a party to the action, am over 18 years of age and reside in Morris County, New

Jersey.

That on the 11th day of June, 2010, I served the within

PLAINTIFF'S RULE 56.1 OPPOSITION TO
STATEMENT OF MATERIAL FACTS BY MOVANTS

on the following attorneys at the address(es) designated by said attorneys for the purpose by

depositing a true copy of same, enclosed in a post-paid properly addressed wrapper, in an official

depository under the exclusive care and custody of the United States Postal Service within New

York State:

> Siobhan M. Sweeney, Esq.
> EDWARDS ANGELL PALMER & DODGE LLP
> Attorneys for Defendants *Pro hac vice*
> 111 Huntington Avenue
> Boston, Massachusetts 02199
>
> KAUFMAN BORGEEST & RYAN LLP
> Attorneys for Defendants
> 120 Broadway, 14th Floor
> New York, New York 10271

_____
BARBARA TATEO

Sworn to before me this
11th day of June, 2010

_____
Notary Public

PATRICIA LYNCH
Notary Public, State of New York
No. 01LY6145452
Qualified in New York County
Commission Expires May 8, 2014

17